## Carman and University of Kentucky v. Hickman County.

(Decided October 17, 1919.)

### Appeal from Hickman Circuit Court.

1.  Constitutional Law—Title of Act.—An act will not be violative of section 51 because the subject matter of the act is stated in the title with more detail than is needed; nor will the number of sections in an act, or the subject matter of these sections, affect its validity if all the sections and provisions are related to one subject expressed in the title and are naturally and reasonably connected.

2.  Constitutional Law—Public Purpose—What Is, for Which Taxes May Be Levied or Appropriations Made.—Under section 171 of the Constitution providing that taxes "shall be levied and collected for public purposes only," a tax may be levied and appropriated to promote the agricultural interests of the state.

3.  Constitutional Law—Public Purpose—What Is.—It is not necessary that the whole body of the contributing public shall be directly the recipients of the benefits accruing from the establishment of the object in aid of which public funds may be set apart. It will be sufficient if it should be of such a character as that it promotes the general welfare and prosperity of the public who are taxed to sustain it.

4.  Constitutional Law—Public Purpose.—It is not essential to the public purpose of an appropriation that all members of the public or all members of any class should derive from it the same or like benefits or advantages.

5.  Constitutional Law—Public Purpose—Public Policy of the State —Weight Given to Opinion of Legislature.—Where there is room for doubt as to whether an appropriation made by the legislature was for a public purpose and pursuant to a public policy of the state the courts will be largely influenced in determining the nature of the appropriation by the legislative expression and the public policy of the state.

6.  Constitutional Law—Public Purpose—Legislative Declaration Not Conclusive.—But a legislative declaration that an appropriation is for a public purpose is not conclusive on the courts and may be the subject of judicial investigation.

7.  Constitutional Law—Grant of Exclusive, Separate Emoluments or Privileges—Agricultural Interests.—An appropriation, although made for the chief benefit of those engaged in agricultural pursuits, will not violate section 3 of the Constitution prohibiting the "granting of exclusive or separate emoluments or privileges except in consideration of public service," as such an appropriation is not for the exclusive benefit of any man or set of men.

8.  Constitutional Law—Prohibition Against Indebtedness—What Is Indebtedness—Order of Fiscal Court.—An order of the fiscal court

made at a time when the limit of indebtedness has been reached appropriating $600.00 to pay the salary of a county agricultural agent at the rate of $66.66 a month and appointing a designated person as agent was the creation of an indebtedness within the meaning of the Constitution.

9. Constitutional Law—Prohibition Against Creation of an Authorized Indebtedness.—Section 157 of the Constitution is as broad a prohibition against the creation of forbidden indebtedness as language could make it. There is no manner in which or any purpose for which such indebtedness will be created that will impart validity to it.

10. Constitutional Law—Prohibition Against Indebtedness—When Appropriation Will Create Indebtedness.—When a fiscal court is prohibited from creating an indebtedness it cannot evade the Constitution by appropriating money for a specified purpose and thereby accomplish the same end as could be done by the creation of a contract debt.

11. Constitutional Law—Prohibition of Indebtedness—Appropriation When Not Creation of Debt.—The mere appropriation of funds by a fiscal court is not the creation of a debt unless the order making the appropriation or some other order to be used in connection with it or as a part of it contains matters showing that the real purpose of the appropriation was to create a debt in some manner or form.

12. Constitutional Law—Prohibition Against Indebtedness—When Appropriation Not Indebtedness.—The mere adoption of resolutions or orders that do not in and of themselves create debts or make appropriations will not be treated as creating indebtedness which can only be done when the order or resolution is completed by the execution of a contract made pursuant to it or the employment of a person authorized by it is entered into.

13. Constitutional Law—Prohibition Against Indebtedness—Evasion of Constitution Not Allowed.—No evasion of the Constitutional limitation against the creation of indebtedness will be tolerated. The court will not be misled or deceived by the mere form of the order making the appropriation or creating the debt or the words in which it is phrased, but will look to the substantial thing designed to be accomplished and if it appears that the order was in fact the creation of a debt or an appropriation of money amounting to the same thing it will be so treated.

14. Constitutional Law—Prohibition Against Indebtedness.—Fiscal Courts in creating an indebtedness or making appropriations amounting to the same thing must take into account all previous valid indebtedness of the county existing when the indebtedness is sought to be created and subtract such existing indebtedness from the income and revenue for the year and only create debts during the year equal to the difference between the existing indebtedness, no matter when created, and the income and revenue of the county for the year.

15. Constitutional Law—Salaries of County Officers—Appropriation to Pay—Who Are Not County Officers.—County officers are officers necessary to carry on the business of the county such as judges, jailers and the like. A person employed to perform some other service not necessary to the conduct of the affairs of the county and that the fiscal court may or may not employ in its discretion is not a county officer in the sense that jailers and county judges are.

CHARLES H. MORRIS, Attorney-General, and D. O. MYATT, Assistant Attorney General, for appellant.

ROBBINS & BENNETT for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL—Affirming.

On August 28, 1918, the fiscal court of Hickman county made and entered on its order book the following order:

"Ordered that the fiscal court of Hickman county co-operate with the College of Agriculture, University of Kentucky, and the United States Department of Agriculture in carrying on agricultural extension work through the activities of the county agent in Hickman county, by appropriating $600.00, said $600.00 to be used as part payment of salary of county agent for the year July 1st, 1918, to July 1st, 1919; it is further ordered that the county agent's salary be paid monthly from this appropriation at the rate of $66.66 2-3 per month, beginning with the month of October, 1918. Further ordered that a county board of agriculture be appointed by the selection of a resident taxpayer from each magisterial district; said district representative to be appointed by the magistrates of the various districts in the county; the members of the fiscal court, the county judge and county attorney to act as ex-officio members of this board. Further ordered that A. Carman be and is hereby appointed county agent of Hickman county for the year July 1st, 1918, to July 1st, 1919."

From this order Hickman county prosecuted an appeal to the circuit court contesting the power and jurisdiction of the fiscal court to employ Carman as county agent and appropriate funds for the purpose of paying his salary. On the hearing of the appeal in the circuit court it was stipulated and agreed by the parties that there was at the time this order was made outstanding claims against the county amounting to the sum of $81,-

200.04 and further agreed that "if the outstanding claims against the county are all valid claims the fiscal court of Hickman county had no authority to contract any indebtedness against the county on August 28, 1918."

On the agreed facts the circuit court ruled that "the Hickman county fiscal court had no right or authority in law to make the order, dated August 28, 1918, by which it appropriated $600.00 to be paid to the appellee, A. Carman, as county agent of Hickman county, to be paid in installments of $66.66 2-3 monthly, beginning with the month of October, 1918, and ending July 1, 1919, and it is further adjudged that said order is null and void, and that the appellee, A. Carman, is not entitled to said $600.00, or any part thereof, and no liability on the part of Hickman county was created by reason of said order."

On this appeal from that judgment it is contended on behalf of the county of Hickman (1) that the act under the authority of which the order and appropriation called in question were made was void because the title of the act did not sufficiently comply with section 51 of the Constitution; (2) that the fiscal court had no power to make the appropriation authorized by the order because the appropriation was not for a public purpose and therefore prohibited by section 3 of the Constitution; (3) that the fiscal court had no jurisdiction or authority to make the appropriation because the indebtedness of the county independent of this appropriation exceeded at the time it was made the constitutional limit.

In 1916 the legislature for the purpose of enabling the state to accept and receive the benefits of an act of Congress providing for co-operative agricultural extension work made possible by the contemplated Federal and state aid enacted the law here in question under a title reading as follows:

"An Act relating to agricultural extension work and home economics; accepting the provisions of the act of Congress providing for co-operative agricultural extension work between agricultural colleges, which act was approved May eighth, nineteen hundred and fourteen; providing that such work shall be done under the directions of the Kentucky University, Lexington, Kentucky; changing the name of said university to University of Kentucky; amending and re-enacting section one of chapter three acts of nineteen hundred and eight; amending and re-enacting section fifteen Kentucky Statutes,

nineteen hundred and three; providing for the appointment of trustees of the University of Kentucky; creating an extension committee to have charge of extension work under the supervision of the University of Kentucky; providing for the election of an executive committee for the University of Kentucky; amending and re-enacting section thirteen of the act of March twenty-first, nineteen hundred and six, creating the State Board of Agriculture, Forestry and Immigration; repealing section two of an act for the benefit of the Department of Agriculture, Labor and Statistics approved March eleventh, nineteen hundred and twelve; appropriating money for the University of Kentucky; providing for the establishment of a marketing bureau; authorizing the fiscal courts of the counties and the boards of education of counties to appropriate money for extension work, and amending and re-enacting section five of an act for the benefit of the Department of Agriculture approved March twenty-first, nineteen hundred and six.''

The act contains ten sections. Section one changed the title of ''the Kentucky University, Lexington, Kentucky'' to ''the University of Kentucky.'' Section two made provision for a board of trustees to administer and control the affairs of the university and provided for an extension committee by amending certain named sections of the Kentucky Statutes. Section three amended and re-enacted section thirteen of an act of March 21, 1906, creating a State Board of Agriculture, Labor and Statistics. Section four repealed an act for the benefit of the Department of Agriculture, Labor and Statistics. Section five made an annual appropriation to the University of Kentucky for the purpose of carrying on agricultural extension work. Section six made provision for the establishment by the university of a co-operative bureau for fostering marketing. Section seven provided that: ''The various fiscal courts and boards of education of the counties in this state are hereby authorized and empowered to appropriate such sums of money out of their annual funds as in their wisdom is necessary to aid in carrying on extension work in agriculture and home economics in their respective counties, and in connection with the University of Kentucky.''

Section eight accepted the provisions of the act of Congress and authorized the University of Kentucky to receive the grants of money appropriated under its provisions. Section nine amended and re-enacted section

five of an act for the benefit of the Department of Agriculture.   Section ten merely declared an emergency for the present taking effect of the act.

It will be observed that all of the provisions of this act relate to and are centered about one subject, which is the acceptance of the benefits and grants of the Congressional legislation, and the promotion of agricultural extension work and home economics with the assistance of the Federal appropriation supplemented by state and local aid, all of which was to be administered by and through the instrumentality of the University of Kentucky.   There is nothing in the act foreign to or that does not relate to this principal subject which is expressed in the title.

The title of the act is perhaps more elaborate than it need have been and may contain surplus matter, but it is neither deceptive nor misleading.   Any person reading it would be advised as to the purpose of the legislation and the things intended to be accomplished under it as well as the fact that it authorized appropriations by both the legislature and fiscal courts.   Nor does it in our opinion violate section 51 of the Constitution providing in part that "No law enacted by the General Assembly shall relate to more than one subject and that shall be expressed in title."

Under this section it has been frequently written, that stating the subject matter of the act more in detail in the title than is necessary does not make the act unconstitutional; and that the number of sections in an act or the subject matter of these sections will not render it obnoxious to the constitution if all of the sections and provisions are related to the one subject; are naturally and reasonably connected and are not foreign to the subject expressed in the title.   Allen vs. Hall, 14 Bush, 85; Bowman vs. Hamlett, 159 Ky. 184; McGlone, Sheriff, vs. Womack, 129 Ky. 274; Mark vs. Bloom etc., 141 Ky. 474; Comth. vs. Starr, 160 Ky. 260; Hyser vs. Comth., 116 Ky. 410.

It is next insisted that this act violates section 171 of the Constitution providing in part that "Taxes shall be levied and collected for public purposes only."   In support of this objection the argument is made that this legislation was enacted solely for the benefit of the farmers and agricultural interests of the state, and this being so was an attempt on the part of the legislature to set apart this class of people and this industry, and appro-

priate for their and its benefit money raised by taxation, therefore the purpose for which the appropriation was authorized was not a public one.

It may readily be conceded that the primary purpose of this legislation was to promote the agricultural interests of the state, but this circumstance, as we will later endeavor to demonstrate, does not render it objectionable to the section of the Constitution invoked.

At the very outset it may be said that it is very often extremely difficult to define with accuracy what is a public purpose for which money collected by taxation may be appropriated; although there is of course no difficulty in ruling that taxes cannot be appropriated for other than public purposes. About this there could be no disagreement, and therefore when a controversy such as comes up in this case arises the only question to be considered is whether the purpose for which the money is to be appropriated is a public one within the meaning of the Constitution.

It is also true that many objects for which money may be appropriated are so clearly public in their nature as that there could not well be any difference of opinion on the subject, such, for example, as public schools, public health and public charities. On the other hand, there are many other enterprises helpful to the public in the community in which they are located and that contribute very largely to the development and progress of the state, that are so purely private in their nature as not to admit of any doubt about the matter. Such, for example, are manufacturing plants established and maintained by private individuals or corporations for purely private gain.

There are also many purposes for which public money may be appropriated that some persons derive more benefit from the use of than others, but this circumstance does not detract from the fact that their chief function is to administer to the public good, although the enjoyment and advantages derived from their maintenance is not distributed equally, even between members of the public who are situated alike or in the same class.

If it was essential to the establishment or existence of an enterprise to be set up and sustained by public aid that all members of the public or all members of any class should derive from it the same or like benefits or advantages, then it would be entirely impossible to describe a public enterprise in aid of which public funds might be set apart. There would not be any.

The truth of this statement is so obvious that no elaboration is needed. It is seen in the operation and conduct of all those uses that are so distinctly public in their nature as to leave no room for doubt as to their public character. There is no public road or public school or public street or public park or public hospital from which some persons do not derive more benefit than others.

It is not, however, necessary that the whole body of the contributing public shall be directly the recipients of the benefits or advantages accruing from the establishment of the object in aid of which public funds may be set apart. It will be sufficient if it should be of such a character as that it promotes the general welfare and prosperity of the people who are taxed to sustain it.

Measured by these standards we have no doubt that public funds may be set apart to develop and promote the general agricultural interests of the state, because it is a matter of common knowledge of which everybody must take notice that in the agricultural interests of the state lie its chief source of wealth, and that the prosperity of the state springing from this source contributes to the growth and importance of every other industry in the state as well as to the comfort and happiness of the whole people. And it is in recognition of this indisputable and thoroughly known fact that appropriations made to stimulate the agricultural interests of the state have always been regarded as made for a public purpose.

This thought was well expressed in Rhea v. Newman, 153 Ky. 604, where the court said in speaking of an appropriation made to the State Fair of the state.

"The State Fair is one of the great institutions of the state. It was created for the purpose of improving and educating the people of the state along highly important lines, and no one will, or can successfully contend, that the State Fair is not one of the most important and essential adjuncts of the state government.

"In these times of greatly increased population and the consequent increased demands for the products of the soil, no other line of business activity conduces as much to the public prosperity as improved farming methods. In order to keep abreast of the times our farmers must use the most approved methods, and the easiest way to induce them to do this, is by causing them to see and thus become interested in what others are doing. The State Fair is an established state institution, and, like its

schools and its penal and charitable institutions, must be maintained by the state, if it is to live."

In Norman v. Kentucky Board of Managers, 93 Ky. 537, the question of the power of the legislature to make an appropriation for the World's Columbian Exposition at Chicago in 1893 came before the court. There, as here, the question was made that the appropriation was not for a public purpose and therefore the legislative act making the appropriation violated the Constitution. And it was said:

"It is often difficult to draw the line which bounds constitutional taxation, or to determine whether the purpose is one in aid of which the taxing power may be invoked, or the money thus raised expended. If it be doubtful, and the legislature has seen proper to exercise the power, the judiciary should not interfere. The doubt is then to be solved in favor of the legislative action. The object in this instance, however, is to exhibit the resources and progress of the state. It is not to promote the interest of one or a few individuals, and perhaps, incidentally, that of the public; but the purpose is public in character and calculated and intended to benefit the entire state. Our legislature has repeatedly heretofore, and running through many years, appropriated money for like purposes, and its power to do so is now for the first time questioned."

Other illustrative cases are Kentucky Live Stock Breeders' Association v. Hager, 170 Ky. 125; Hager v. Kentucky Children's Home, 119 Ky. 235; Bosworth v. Harp, 154 Ky. 558.

The public policy of the state that has found expression from the very beginning in many legislative enactments setting apart public funds for the purpose of promoting the agricultural interests of the state is also entitled to weighty consideration in determining whether an appropriation in aid of this industry is for a public purpose within the meaning of the Constitution. And if there was room for doubt on the question whether the appropriation made under this legislation was for a public purpose we would be largely influenced by this public policy of the state to hold that it was, although it should be here said that the legislature is not invested with conclusive power to determine for itself what is and what is not a public purpose.

In Cooley on Taxation, vol. 1, page 182, this learned writer in treating the point now under consideration said:

"It is also agreed that the determination what is and what is not a public purpose belongs in the first instance to the legislative department. It belongs there because the taxing power is a branch of the legislative, and the legislature cannot lie under the necessity of requiring the opinion or the consent of another department of the government before it will be at liberty to exercise one of its acknowledged powers. The independence of the legislature is an axiom in government; and to be independent, it must act in its own good time, on its own judgment, influenced by its own reasons, restrained only as the people may have seen fit to restrain the grant of legislative power in making it. The legislature must, consequently, determine for itself, in every instance, whether a particular purpose is or is not one which so far concerns the public as to render taxation admissible.

"But it is also admitted that the legislative determination on this subject is not absolutely conclusive. It may be sufficently so to put the administrative machinery of the state in motion; but when the exaction is made of an individual, and the power of the state is made use of to compel submission, he has always the right to invoke the protection of the law. And an appeal to the law for protection of individual property must necessarily render the question, which lies at the foundation of the demand, a judicial question, upon which the courts cannot refuse to pass judgment.

"It is not inconsistent with this doctrine that in every instance the highest consideration should be paid to the determination of the legislature that a tax should be laid. It is not lightly to be assumed that its members have come to the examination of the subject with any other than public motives, or that they have failed to give it due investigation or reflection. The presumption on the other hand must always be that they have considered it with honesty and fair purpose, and that their action is the result of their deliberate judgment. And with all these presumptions tending to support the legislative action, it would seem but reasonable and proper that the courts should support it when not clearly satisfied that an error has been committed. This is the general rule in constitutional law when the validity of legislation is involved, and it is applicable with peculiar force to the case

of a legislative decision upon the purpose of which a tax may be laid.

"For, in the first place, there is no such thing as drawing a clear and definite line of distinction between purposes of a public and those of a private nature. Public and private interests are so commingled in many cases that it is difficult to determine which predominates; and the question whether the public interest is so distinct and clear as to justify taxation is often embarrassing to the legislature, and not less so to the judiciary."

It is next said that this legislation was forbidden by section 3 of the Constitution, providing in part that "No grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men except in consideration of public service."

In support of this contention the argument is made that as this legislation was primarily designed to confer special benefits and privileges on the farmers of the State it falls within the condemnation of this provision, and reliance is had on the case of Baker v. Crum, 177 Ky. 637. In that case the question before the court was whether the various counties of the state might select in accordance with the legislative act certain described boys and pay their tuition in and traveling expenses to the University of Kentucky out of the public funds, while other boys desiring to attend the same institution must pay their own tuition and expenses, and the court held that this legislation was an effort to confer upon this favored class separate emoluments and privileges without the pretense that they had performed any such public service as would entitle them to the emoluments and privileges authorized by the legislation, and in the course of the opinion said:

"The statute under consideration can, therefore, be sustained only upon the theory that these students have rendered such public service as would entitle them to something more at the hands of the state than the thousands of other worthy girls and boys in precisely the same situation. But they make no such claim, and cannot truthfully do so. It would seem, therefore, that the case against them stands confessed and that it is unnecessary to define the terms 'public emoluments or privileges,' or 'public service,' as used in the Bill of Rights."

We do not, however, find any similarity between the legislation condemned in the Barker case and the legislation here drawn in question. In the Barker case the

public funds were sought to be appropriated for the benefit of a few favored boys in each county in the state while other boys equally as deserving were denied these emoluments. It did not and could not be made to appear that the progress or growth or wealth or welfare of the state could be promoted by the privileges conferred on the few boys who were selected from a large number as the recipients of state bounty, and when it was confessed that they had performed no public service entitling them to this distinction there was nothing left for the act to stand on.

While in the case we have, the appropriation, although it may be treated as having been made directly to and for the chief benefit of those engaged in agricultural pursuits, its ultimate purpose was plainly to develop the great agricultural interests of the state and thus contribute to the welfare and wealth of the people of the whole state. In no sense can it be fairly said that the emoluments and privileges conferred by this act were confined to any man or set of men within the meaning of the section of the Constitution relied on.

The other objection urged to the act is that it violates section 157 of the Constitution reading in part: "No county, city, town, taxing district, or other municipality shall be authorized or permitted to become indebted, in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose; and any indebtedness contracted in violation of this section shall be void. Nor shall such contract be enforceable by the person with whom made; nor shall such municipality ever be authorized to assume the same."

It will be observed that this section is as broad a prohibition against the creation of forbidden indebtedness as language could make it. There is no manner in which, or any purpose for which, such indebtedness may be created that will impart validity to it.

With this understanding of the meaning and effect of this section we will now consider the grounds upon which the order adopted by the fiscal court is assailed as well as those upon which it is sought to be sustained.

It is conceded that at the time the order of the fiscal court was made the indebtedness of Hickman county exceeded the constitutional limit if it was all a valid indebtedness, and for the purposes of this case we must as-

sume that it was. It would, of course, be manifestly improper on this record to which there are no parties except Carman and the University of Kentucky on the one side and Hickman county on the other to pass on the validity of the existing indebtedness of Hickman county or any part thereof.

Nor are we asked to do this, because counsel for Carman and the university for the purposes of their argument assume the indebtedness of Hickman county to be valid and rest their case in support of the validity of the additional indebtedness sought to be created by this fiscal court order upon the ground that it was not the creation of an indebtedness within the meaning of section 157 of the Constitution, but merely an appropriation.

The argument is that section 157 "does not attempt in any manner to restrict the fiscal courts in the appropriation of the funds in the county treasury or that are expected to be derived from the county assessments until the existing indebtedness of the county is liquidated. In other words there is nothing in the constitutional provision to prohibit the fiscal court from permitting the debt that has previously been contracted from going on another year and in the meantime permitting the fiscal court to expend the county funds for the necessary and legitimate expenses of the county for that year."

The effect of this argument as we understand it is that a fiscal court may, after the limitation on the amount of indebtedness that may be created has been reached and no more can be incurred, make orders appropriating money for a specified purpose and thereby accomplish the same end and do the same things as could be done by the creation of contract debts, but yet these appropriating orders would not be the creation of an indebtedness in the meaning of the Constitution. We do not appreciate the soundness of the distinction attempted to be made and are quite sure that no authority can be found for it in the section of the Constitution referred to or any opinion of this court.

If the evasion of this section advocated by counsel should be sustained the wholesome limitation contained in the Constitution would practically have no meaning or effect and there would be no limit to the indebtedness a fiscal court might create. For example, if a fiscal court found that it was prohibited by the Constitution from making an express contract with a party to perform for a specified sum a public service such as the building of

a bridge or erection of a court house, it could get around this obstacle by merely appropriating the sum needed for the purpose and then enter into a contract with a builder to do the work for the sum appropriated. This, of course, would be the merest subterfuge, but it is exactly what was attempted to be done by the order made in this case.

But fiscal courts or other boards invested with like power to appropriate public funds will not be allowed to thus set aside the limitations upon their authority. Of course the mere appropriation of funds by a fiscal court is not the creation of a debt unless the order making the appropriation or some other order to be used in connection with or as a part of it contains matter showing that the real purpose of the appropriation was to create a debt in some manner or form.

And in determining whether a fiscal court has exceeded its power and jurisdiction under section 157, the court will not be misled or deceived by the mere form of the order or the words in which it is phrased, but will look to the substantial thing designed to be accomplished by it. And if it appears that the order was in fact the creation of a debt, or an appropriation of money amounting to the same thing as the creation of a debt it will be so treated.

In Rhea v. Newman, 153 Ky. 604, the court in pointing out the difference between an appropriation and the creation of an indebtedness was careful to say that "We do not mean to be understood as saying that an appropriation may not constitute a debt. It may be of such a character as to have all the essential elements of a contract, and in such a case unquestionably it would be a debt."

In Ramsey v. City of Shelbyville, 119 Ky. 180, the question before the court was whether the city council of Shelbyville had the power to appropriate sums of money to a free public library established in the city by the generosity of Andrew Carnegie. The ordinance making the appropriation set out that "there be and now is appropriated to the support and maintenance of the Shelbyville free public library the sum, one thousand dollars per annum, same to be paid in quarterly payments of two hundred fifty dollars each to the treasurer as long as said library is in existence." The ordinance was attacked by certain taxpayers as being in violation of section 157 of the Constitution, and in support of the ordinance it

was said that it created no indebtedness, but the court in rejecting this argument, said:

"Nor do we see, that it can be maintained that the ordinance does not create an indebtedness, within the meaning of the Constitution. It creates an obligation beyond the revenue provided for the year by the act of the municipal authorities without the assent of the voters. . . . . If the council can do this, it can contract other obligations in advance, and thus entirely defeat the purpose of the constitutional provision, which is to require that the municipal authorities shall not in one year create obligations beyond the revenues provided for that year. . . . . The language of the Constitution is very broad —'become indebted in any manner or for any purpose.' An obligation payable in future is no less a debt, within the meaning of this provision, than if payable at once. An obligation to pay which may be defeated by the happening of some contingency—as, in this case, the library ceases to exist—is certainly an obligation until the contingency happens. Such an obligation must fall within the words 'indebted in any manner or for any purpose.' The contingency upon which the city is to be released from the obligation may never happen, and it is plain that the contemplation of the parties is a permanent public library, to be maintained permanently by taxation. If such an obligation is not within the interdiction of the constitutional provision, it is hard to understand what practical effect would be given to it, for there are few obligations that might not be so framed as thus to avoid its operation."

And so if this order had merely appropriated $600.00 to be used in the payment of the county agent when he was appointed or selected it would not have been at that time or until the county agent was selected and employed the creation of an indebtedness or an appropriation that amounted to the same thing, and the constitutional limitation would have no application.

The mere adoption of resolutions or orders that do not in and of themselves create debts or make appropriations could not be deemed the creation of an indebtedness because the indebtedness could only be created when the order was completed by the execution of a contract made pursuant to it or the employment of the persons authorized by it was entered into.

Thus in City of Louisville v. Parsons, 150 Ky. 420, the city council on August 27, 1907, adopted a resolution

authorizing the mayor of the city to appoint a commission to employ certain persons to do certain described things and thereafter pursuant to this authority the commission employed Parsons.  It further appeared that at the time this resolution was adopted the city was prohibited by the limitations of section 157 of the Constitution from creating the indebtedness contemplated in the employment the commission was authorized to make, but the court said: "The adoption of the resolution did not create any indebtedness.  The indebtedness was not created until the employments provided for in the resolution were made, and these employments were not made until after the beginning of the next fiscal year.  This being so, no indebtedness was created payable out of the revenues of the year in which the resolution was adopted, and the mere adoption of the resolution did not violate the constitutional provision. . . . . This section of the Constitution does not prohibit the adoption of an ordinance that may never create any liability on the part of the city or that does not in itself incur an indebtedness exceeding the income and revenue provided for the year in which the ordinance is adopted.  If it is optional on the part of the city to incur the indebtedness contemplated by the ordinance, no liability is created until the city has elected to create the liability.  But if the ordinance by its terms and of itself created indebtedness or incurs liability, its validity must be submitted to the test provided in section 157 of the Constitution."

Looking now again to this order it is perfectly plain from its reading that the fiscal court by it intended to and did create an indebtedness in the manner proposed by the order.  That was the only purpose and effect of the order.  It employed Carman as county agent for one year, fixed his salary at $66.66 2-3 per month and appropriated $600.00 to be used in part payment of it.  If Carman had performed  the service contemplated by the order and the fiscal court was at liberty to contract to pay him the sum specified there could be no doubt that Carman could maintain an action against the county to recover the amount of his salary.

In making this order the court was apparently doubtful of its power under the Constitution to make a direct contract with Carman to render the desired service at $66.66 2-3 a month and so it adopted the method employed in the order under the impression that in this

way it might compensate Carman and not violate the Constitution, forgetting that the Constitution declares that prohibited indebtedness shall not be created "in any manner or for any purpose."

There is also an attempt to justify this order upon the ground that in making the appropriation and employing Carman the county was providing for a necessary current expense, such, for example, as the payment of the salaries of its county officers for which provision could be made by making an appropriation, although the county indebtedness exceeded the constitutional limit.

But Carman was not such an officer of the county as that it was under the necessity of paying his salary like it would have been in the case of the county judge or jailer, nor did the compensation agreed to be paid him come under the necessary current expenses of the county because his employment was entirely within the discretion of the fiscal court and his services not essential to the conduct of the ordinary business of the county.

In McCrocklin v. Nelson County Fiscal Court, 174 Ky. 308, and Nelson County Fiscal Court v. McCrocklin, 175 Ky. 199, we had occasion to set out at some length the limitations imposed by section 157 of the Constitution on fiscal courts, city councils and like bodies, and without repeating what was there said it is sufficient to say that it was held that fiscal courts in estimating the indebtedness that may be created at any time must take into account all previous valid indebtedness of the county, except such as has been authorized by the voters at an election held for that purpose, existing when the indebtedness is sought to be created, and subtract such existing indebtedness as well as such sum as may be needed to defray the necessary current expenses of the county for the year from the income and revenue for the year, and only create debts during the year equal to the difference between the existing indebtedness, no matter when created, plus the sum necessary to pay the necessary current expenses for the year, and the income and revenue of the county for the year. Whenever it is sought to create an indebtedness in excess of the revenue for the year the people at the polls must authorize it—the fiscal court cannot.

It would be well for fiscal courts before they undertake to appropriate public funds or create indebtedness to read these two opinions.

Having reached the conclusion that the fiscal court had no power to make the appropriation created by this order the judgment of the circuit court is affirmed.