**INDUSTRIAL DEVELOPMENT AUTHOR-ITY et al., Appellants,**

v.

**EASTERN KENTUCKY REGIONAL PLAN-NING COMMISSION, Intervenor**
(Orba F. Traylor, Commissioner, etc., Appellees).

Court of Appeals of Kentucky.

Feb. 12, 1960.

Jo M. Ferguson, Atty. Gen., Seth T. Boaz, Jr., Asst. Atty. Gen., for appellants.

Henry Meigs, II, Frankfort, for intervenor.

Paul E. Hunley, Frankfort, for appellees.

STEWART, Judge.

This is an appeal from a judgment of the Franklin Circuit Court holding that Senate Bill 315 (later Chapter 152 of the Acts of 1958 and now designated as KRS Chapter 154) violates Sections 171 and 177 of the Constitution of Kentucky. We shall refer to KRS Chapter 154 as "the Act".

This was an agreed case submitted under KRS 418.020. It arose when the Commissioner of Finance refused to transfer funds to the Industrial Development Finance Authority created by the Act. The refusal was based on the grounds that the Act violated Sections 3, 171 and 177 of the Constitution of Kentucky.

The Act in controversy creates the Industrial Development Finance Authority (hereinafter called the Authority) as an agency independent of the executive branch of the state government. See KRS 154.020 (1). The members of this body receive no compensation for their services as members. The Authority shall promulgate regulations governing its proceedings and its determinations of eligibility for loans. See KRS 154.060.

KRS 154.020(2) states that the Authority shall consist of the Lieutenant Governor who shall be the chairman, the Commissioner of Banking, the Commissioner of Economic Development, the Commissioner of Economic Security, and the Commissioner of Finance, and three additional members appointed by the Governor, one each to be appointed from lists of nominees submitted by the Kentucky State Bankers Association and the Kentucky Chamber of Commerce, and a third to be a Kentucky member in good standing with the National Association of Securities Dealers.

Under the provisions of KRS 154.070(1) any local development agency may apply to the Authority for assistance in an industrial building project (see KRS 154.010(3)) or an industrial subdivision project (see KRS 154.010(4)) and the Authority is directed to hold such hearings and examinations as shall be necessary to determine whether the public purpose of the Act will be accomplished by granting financial assistance (in the form of loans) to such applicants.

KRS 154.010(2) defines a local development agency as "any incorporated organization, foundation, association or agency, regardless of the particular name, to whose members or shareholders no profit enures, and which has as its primary function the promotion, encouragement and development of industrial and manufacturing enterprises."

The Authority is empowered by KRS 154.080, under the circumstances detailed therein, to make loans to a local development agency when it has determined that a particular industrial building project has accomplished or will accomplish the public purposes of the Act, in an amount not to exceed 30% of the cost or estimated cost of such industrial building project, as established or to be established.

Under the terms and conditions of KRS 154.090 and 154.100, before granting loans on industrial building projects not yet established, or on such projects already in existence, the local development agency must furnish proof it holds or has available or has expended or applied funds or property equal to not less than 20% of the estimated cost or the cost of establishing such project. It is also provided in these two statutes that the local development agency must show it has a firm commitment from other independent and responsible sources, over and above the loan from the Authority, necessary for the payment of all estimated cost of establishing the industrial building project. Other conditions are imposed by these two statutes which, for the purposes of this opinion, we feel we need not set forth.

KRS 154.110 provides that when the Authority has determined that the establishment of a particular industrial subdivision project will accomplish the intent of the Act, it may contract to lend a local development agency an amount not in excess of 50% of the cost or estimated cost of such project. KRS 154.120 details certain con-

ditions that must be met by the local development agency and that must exist in respect to the proposed industrial subdivision project in order to justify the granting of the loan by the Authority.

Under the Act the General Assembly may appropriate funds to a special revolving trust and agency fund in the Treasury of the Commonwealth to be known as the Industrial Development Finance Fund. Funds obtained from other sources and from repayment of loans would also go into this fund to carry out the purposes of the Act.

The lower court decreed the Act trespasses upon Sections 171 and 177 of the Constitution of Kentucky and accordingly declared it invalid. This appeal is from that ruling. We shall discuss these two sections as they relate to the Act and, in connection with them, Section 3 of the Constitution of Kentucky, since it is also contended the Act contravenes the last-mentioned constitutional provision. Sections 3 and 171 will be considered together because, broadly speaking, they are interrelated as to the main object they seek to enforce.

Section 3 provides, in part: "* * * no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services * * *." So far as pertinent here, Section 171 reads: "Taxes shall be levied and collected for public purposes only * * *."

This Court has recognized that the quoted excerpts taken from Sections 3 and 171 are closely allied, pointing out in Nichols v. Henry, 301 Ky. 434, 191 S.W.2d 930, 933, 168 A.L.R. 1385, that "* * * an Act which constitutes a violation of the spirit of the one likewise constitutes a violation of the spirit of the other; * * *. In fine, the inhibitions enumerated relate to private purposes as contradistinguished from public purposes; * * *."

■ Thus the Constitution of this state requires that taxes shall be exacted and used for public purposes only. Obviously if money is appropriated out of the treasury it must be measured by the same test as that by which it is raised by taxation and put into the treasury. If taxes could not be imposed for a purpose, money already in the treasury could not be appropriated to that purpose. See Hager v. Kentucky Children's Home Society, 119 Ky. 235, 83 S.W. 605, 67 L.R.A. 815.

■ In determining whether an appropriation is for a public purpose we believe we should accept in this case the pragmatic view expressed by O'Rear, J., in Hager v. Kentucky Children's Home Society, supra, 83 S.W. on page 608, that: "* * * the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or not; that the appropriation is not made for the agency, but for the object which it serves; the *test is in the end, not in the means*. (Emphasis added.) The limitation put upon the state government by the people is as to what things it may collect taxes from them for, to which it may apply their property through taxation; not upon the means by which or through which it will do it."

Who is to determine what is a "public purpose"? The legislature is given this primary duty. This pertinent statement appears in Shean v. Edmonds, 89 Cal.App. 2d 315, 200 P.2d 879, 885, quoting from County of Alameda v. Janssen, 16 Cal.2d 276, 281, 106 P.2d 11, 14, 130 A.L.R. 1141: "The determination of what constitutes a public purpose is primarily a matter for legislative discretion * * * which is not disturbed by the courts so long as it has a reasonable basis." See also Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80, wherein relief of unemployment and encouragement of industry were accepted as "public purposes."

■ In the present instance, KRS 154.-005 clearly sets out the legislative determination that the purpose of the Act is to promote the health, safety, morals, right to gainful employment, business opportunities

and general welfare of Kentuckians and recites that the Authority "shall exist and operate for the public purpose of alleviating unemployment and furthering the utilization of natural and man-made resources by the promotion and development of industrial and manufacturing enterprises in local communities of the Commonwealth." The consummation of these objects shall be "public purposes for which public money may be spent."

As the central aim of the Act is to foster industrial development by attracting new industry to all parts of the state in order to reduce unemployment and in order to use the natural and man-made resources of the state as a whole, the inquiry is raised as to whether such an aim is a public purpose so as to warrant the expenditure of tax funds therefor. This Court in the fairly recent case of Dyche v. City of London, Ky., 288 S.W.2d 648, held that the relief of unemployment in the City of London and the surrounding area was a "public purpose" within the purview of the taxing power of that city, and that the City of London could lawfully incur a bonded indebtedness to construct an industrial building in an effort to attract new industry and thereby reduce unemployment. In Faulconer v. City of Danville, cited above, we held that the acquisition and ownership by the City of Danville of an industrial building was a "public project" within the application of KRS Chapter 58 which authorized the issuance of revenue bonds for such an object.

From the foregoing authorities we conclude it is clearly established in this jurisdiction that the relief of unemployment is a public purpose that would justify the outlay of public funds.

The Dyche opinion cited with approval Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436, Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So.2d 394, and Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245, all of which cases held that the relief of unemployment is a proper object for the utilization of tax money.

We believe the Act we are examining will serve a public purpose in the sense that the state as a whole will receive a benefit therefrom. The case of Carman v. Hickman County, 185 Ky. 630, 215 S.W. 408, dealt with an act that, among other things, appropriated state funds for agricultural extension work in this state to be carried out in the various counties of Kentucky. This enactment, as is the one now under consideration, was charged, among other grounds, as falling within the condemnation of Sections 3 and 171 of the Constitution of Kentucky. One of the chief attacks leveled at the appropriation was that the farmers and agricultural interest of this state constituted a limited number of persons or groups that would derive a greater advantage in particular than the public at large from such an expenditure of tax money. This Court struck down this contention, holding that it was an indisputable and thoroughly known fact that legislative grants of money made to stimulate agriculture redounded to the welfare and prosperity of the people whose taxes were used for such a purpose.

In these days when mechanized agricultural methods are producing more and more surplus crops, and crop quotas have become an established practice, farming is no longer a way of life for an untold number of Kentuckians. Large segments of the rural population have drifted into the urban areas of this state, and unemployment with its attendant evils has become an ever-present major problem facing most of our cities and counties. These local units of government have, for some time, been compelled to take steps, involving the use of tax money, to cope with this problem. We can conceive of no sound reason why the Commonwealth should not help out where help is so badly needed with some form of financial assistance.

We realize that the fulfillment of the intent of the Act will undoubtedly accord private industry considerable profit, yet the ultimate objective of the Act, and its declared purpose, is not only to check unem-

ployment but also to foster the prosperity of the people in the state as a whole. We have called attention to the fact that this Court had no hesitancy in pronouncing as valid legislative allotments designed to give vigor to the agricultural progress of the state. It is our view that encouraging industry to locate in Kentucky, and using tax money to bring about such a result, adds up to the same end that we have sought for many years in backing agriculture with state funds.

It is therefore our opinion the Act does not contravene the provisions of Sections 3 and 171 of our Constitution.

We come now to a consideration of whether the Act runs afoul of the provisions of Section 177 of the Constitution of Kentucky, which reads: "The credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association, municipality, or political subdivision of the State; nor shall the Commonwealth become an owner or stockholder in, nor make donation to, any company, association or corporation."

The part of Section 177 to which our attention is directed by the opponents of the Act is the prohibition against giving, pledging or loaning the credit of the Commonwealth "to any individual, company, corporation or association, municipality, or political subdivision of the State." Those who contest the Act seriously urge that the investment of state funds in an industrial project would do violence to the part of the section we have noted.

The transactions the Authority would be empowered to make under the Act would involve only a loan of state funds. In such a case, the Authority would not be giving or pledging or lending the credit of the state, because the Authority would not be undertaking to become a surety on, or guarantor of the payment of, any bonds or other obligations in which the state's money was invested. It would be in the position of a creditor rather than in that of a debtor, which last-mentioned situation arises upon

a pledge or loan of credit. See Fairbank v. Stratton, 14 Ill.2d 307, 152 N.E.2d 569.

The Act under consideration is similar to the private procedures used in other states to encourage the location of industries therein. In Arkansas two such acts have been passed on by the courts of that state. Before exploring these cases we should point out that Arkansas has a constitutional provision similar to our Section 177, which reads that: "Neither the State nor any city, county, town or other municipality in the State, shall ever lend its credit for any purpose whatever." Const.Ark. art. 16, § 1.

In 1955, the Arkansas Legislature passed "Act 404" for the industrial development of the state. It created a State Industrial Development Commission and set forth its duties. It authorized fifteen or more natural persons in any city, town or county to organize a non-profit corporation for the industrial development of their area. The corporation must be approved by the Commission, and it would be set up to bring new industrial plants to the community. The local corporation could issue bonds that might be secured by a mortgage on the physical assets of the local corporation for the construction of the plant, which it would then sell, rent or give to any industry as an inducement to locate in the community. The act empowered the State Board of Finance to purchase up to one-half of the issue of the first lien industrial bonds issued by the local corporation and the remaining bonds would be sold to the public.

In Halbert v. Helena-West Helena Industrial Development Corp., 226 Ark. 620, 291 S.W.2d 802, Act 404 was tested. The act, except for two sections not of interest here, was upheld. One contention was that it infringed upon the constitutional section above quoted, but the Supreme Court of Arkansas found no merit in the contention, saying, 291 S.W.2d on page 808: "Section 34 of Act 404 authorizes the State Board of Finance 'in its discretion' to purchase from local development corporations

fifty per cent of the principal amount of the bond issue up to a certain amount. The State is certainly not lending its credit to the local development corporation when it purchases bonds and receives the bonds. * * * Whether the State Board of Finance invests the State's surplus in one kind of bond or another is a matter for the Legislature to permit, and for the State Board of Finance to then decide in the exercise of its discretion. Certainly the Legislature can determine what kind of securities can be purchased by the State Board of Finance in its discretion; and until it is shown—and it has not been shown here—that the State Board of Finance has abused its discretion or that such investment impairs the State's ability to pay outstanding obligations as they mature, then no case is made by the appellants under this point."

See also Andres v. First Arkansas Finance Corporation, Ark., 324 S.W.2d 97, where a later state financial assistance act for industrial development, more comprehensive than Act 404, was upheld.

In Almond v. Day, 197 Va. 782, 91 S.E. 2d 660, a mandamus proceeding was instituted to determine whether or not the Board of Trustees of the Virginia Supplemental Retirement System might invest funds under its control in certain securities which it desired to purchase, and which a legislative enactment permitted it to buy. Section 185 of the Constitution of Virginia is similar in its import to our Section 177 in that it provides the credit of the state should not be "granted to or in aid of any person, association or corporation." After stating that the retirement system was a state agency and its funds constituted state money, the Supreme Court of Appeals of Virginia determined there was no "lending of the state's credit" under the facts stated, saying in 91 S.E.2d at page 667: " * * * When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another. Mere-

ly because the State incurs an indebtedness or expends its funds for its benefit and others may incidentally profit thereby does not bring the transaction within the letter or the spirit of the 'credit clause' prohibition."

We conclude the plan that will be executed under the Act is not prohibited by any of the provisions of Section 177 of our Constitution.

We have come full circle to "public purpose" once more, and such must be the basis of this decision. We are not unmindful of the fact that we are approving a law that has not yet been put in force, so that its full impact on the general welfare of the people of this state cannot be appraised in a specific manner. It is our opinion, however, the Act in its over-all application is designed to serve the inhabitants of the state at large and not a few scattered communities. Should there be instances where the action of the Authority is manifestly arbitrary and unreasonable, the courts could easily be resorted to for relief to the end that any unwarranted action could be nullified.

Wherefore, the judgment is reversed with directions that the judgment be set aside and a new one entered upholding the constitutionality of the Act.


BIRD and PALMORE, JJ., dissenting.


PALMORE, Judge (dissenting).

In Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80, and Dyche v. City of London, Ky., 288 S.W.2d 648, funds raised by the sale of municipal bonds were converted into the form of industrial property owned by the city and to be leased for manufacturing purposes. In the Danville case the use of money raised by taxation was not involved. In the London case the bonds were secured by the taxing power of the city. In each situation, presumably, the ultimate disposition of the property will be a conveyance to the lessee when the full

cost has been liquidated through the rental payments. In each case, therefore, the public investment remains intact in that the ownership of the property is retained in the public authority unless and until the money is replaced. But the present case goes a step farther. Money raised by taxation is *loaned* by the Industrial Development Authority to a private, nonprofit corporation, which in turn carries out the function performed by the city in the Danville and London cases. The property into which the funds ultimately are converted will be owned not by any public agency, but by a corporation which, though nonprofit, is nonetheless a private corporation. In lieu of the property itself, the public authority will own only the notes of this private, nonprofit developmental corporation. It is not required that they be first mortgage notes. In fact, the act specifically provides that the funds to be furnished by or available to the local development corporation as a prerequisite to the loan from the public authority may be obtained "from other independent and responsible sources, such as banks and insurance companies or otherwise." Thus the final result is that money raised by taxation will be converted into the form of promissory notes secured by inferior liens. If this can be upheld on the basis of public purpose, so could outright grants of money to the local development corporations. By the same logic, there is no reason why outright loans or grants of tax money directly to private manufacturing corporations cannot be sustained, since the resulting employment of personnel would relieve unemployment and thereby serve a public purpose. I am not willing to go that far just yet, for it seems to me that the taxpayers of this state, sorely pressed as they are, have the right to look to their constitution for protection against speculation with their money.

The majority opinion in this case is excellently written, and it follows a modern trend. But its real effect is to justify everything and anything in the name of "public purpose," no matter how remote or incidental the ultimate fulfillment of that purpose may be, and to wash its hands of the responsibility for that determination, leaving it almost arbitrarily to the Legislature. Conceding that the Constitution ought to be liberally construed as the world changes, that it should not be so straitly interpreted as to become a suicide pact, yet neither should it be blown to and fro with every passing wind or storm. Our haste in molding it to the hue and cry of the day must be tempered by deliberation. A spirit of moderation is demanded by the solemnity of the document itself. Private enterprise is not dead yet, nor is it ready for the rite of extreme unction for which the philosophy of this decision seems to be preparing it.

It may be argued, of course, that whether public money or property is loaned, given or leased, the public purpose is the same, the loss or risk of loss being immaterial, but I do not think so. The state should have no more right to speculate its money on a privately owned business venture than it does to bet it at the race track. There is a difference between an investment and a gamble. Tested by Section 171 of the Constitution one is legitimate and the other is not. Whether the expenditure is for a legitimate public purpose resolves itself into the question of "whether it bears directly and immediately or only remotely and circumstantially upon the public welfare" (cf., Opinion of the Justices, 99 N.H. 528, 114 A.2d 514, 516), and that is a question into which, under the checks and balances secured by our constitutional form of government, the taxpayers are entitled to expect a substantial judicial inquiry. With the greatest of respect to my brothers of this Court, I can honestly answer that question in only one way: The public purpose in this case is too remote and speculative to satisfy Section 171 of our Constitution. See opinion of Chief Justice Carroll in Carman v. Hickman County, 185 Ky. 630, 215 S.W. 408, 411.

BIRD, J., joins me in this dissent.