**Wendell P. BUTLER, Superintendent of Public Instruction, et al., Appellants,**

v.

**UNITED CEREBRAL PALSY OF NORTHERN KENTUCKY, INC. et al., Appellees.**

Court of Appeals of Kentucky.
Dec. 15, 1961.

John B. Breckinridge, Atty. Gen., Troy D. Savage, Asst. Atty. Gen., for appellants.

James C. Ware, Covington, for appellees.

PALMORE, Judge.

The Ware Act of the 1960 General Assembly (Senate Bill 253) authorizes public aid to private institutions for the education of "exceptional children." Except for the section establishing an appropriation from the general fund, it is set forth in KRS 157.305. This action tests its validity.

In its entirety, KRS 157.305 reads as follows:

"(1) In lieu of the statutory requirements concerning education of exceptional children and until such time as the local boards of education are able to provide adequate instruction and facilities for exceptional children in their respective districts, private schools that are now established and are providing instruction and facilities for exceptional children may qualify as state schools for exceptional children.

"(2) To qualify as a state school for the exceptional children a private school shall:

"(a) Submit to the State Board of Education with its application for such qualification the names and addresses of the governing body of the school. The State Board of Education may approve or disapprove the governing body as it exists or may appoint such additional members thereto as it deems advisable;

"(b) Submit the type of instruction and program now being provided, the qualifications of the instructors employed and the facilities now available. The State Board of. Education may approve or disapprove the program, personnel or facilities now existing or it may make its approval contingent on such recommended improvements as it deems advisable.

"(3) Once a school has qualified as a state school for exceptional children, the State Board of Education upon the recommendation of the Superintendent of Public Instruction may allow to such school one hundred dollars annually per exceptional child in average daily attendance; provided that such school meets and continues to meet the standards promulgated by the State Board of Education for schools qualifying under this section." (1960, c. 107; effective June 16, 1960.)

The Superintendent of Public Instruction and Kentucky State Board of Education take the position that the statute violates Sections 3, 27, 28, 59, 171, 177, 184, 186 and 189 of the Constitution of this state, and they appeal from a judgment of the circuit court declaring otherwise.

In its laconic simplicity the act leaves much to be desired. However, it is not ours to disapprove if it can reasonably be upheld. Cf. Bowman v. Frost, 1942, 289 Ky. 826, 158 S.W.2d 945, 946. So, before taking up the constitutional questions, let us dispose of whatever ambiguities can fairly be removed by the process of interpretation.

■ First, what is meant by "exceptional children"? Is this euphemistic generality sufficiently definite to state an intelligible legislative intent? Standing alone, we should probably say not, but examined in the context of the whole enactment, we believe it is. Subsection (1) clearly expresses a recognition that there are children not within the normal range of those whom the common school may be equipped to serve. Though we think immediately of the physically or mentally handicapped, the term might also include the exceptionally gifted, the genius. At any rate, it covers those children within this state who would be entitled to attend its common schools, but for whom the state board, in its reasonable discretion, concedes that the program and facilities of a particular school district are thus far inadequate. The power to make the definition more specific lies in the state board of education.

■ Next arises the question of whether the determinations relating to eligibility are left to the untrammelled discretion of the Superintendent or the state board. This, of course, would attempt to permit the administrative agency to do what Const. § 59 forbids to the legislature itself. Surely this was not intended. On the contrary, subsection (3) speaks of "standards promulgated by the State Board of Education," which we regard as a mandate to formulate and establish such reasonable and uniform regulations as are necessary to a just and proper administration of the act.

■ The main questions we see in this case are these: (1) Does the act have a valid public purpose within the scope of Const. §§ 3, 171 and 177? (2) Does it constitute illegal class or special legislation under Const. §§ 3 or 59? (3) Does it attempt to spend money "for education" or out of "the public school fund" within the meaning of Const. §§ 184 and 186? (4) Does it attempt to delegate legislative power to an administrative agency in violation of Const. §§ 27 and 28? (5) Does it authorize aid to sectarian schools, as forbidden by Const. § 189? We shall discuss them in that order.

In Hager v. Kentucky Children's Home Soc., 1904, 119 Ky. 235, 83 S.W. 605, 608, 67 L.R.A. 815, this court said by way of illustration that "the special education of the deaf and dumb, the blind, and of the feeble minded" can rightfully be made a public charge. Indeed, if it is a valid public purpose to educate anyone at all, must it not be equally so with respect to all who can be elevated to more constructive citizenship by the process of education? What the people through their elected representatives choose to do, whether it be in the form of education or some other type of assistance, in order to develop the capabilities of those who probably otherwise will be either a detriment or a dead weight to society, has the public welfare as its central aim. That is the test of a "public purpose." See Carman v. Hickman County, 1919, 185 Ky. 630, 215 S.W. 408; Hendrickson v. Taylor County Farm Bureau, 1922, 196 Ky. 75, 244 S.W. 82; Bowman v. Frost, 1942, 289 Ky. 826, 158 S.W.2d 945; and Industrial Development Authority v. Eastern Kentucky Regional Planning Comm., Ky.1960, 332 S.W.2d 274.

The financial aid provided by this legislation goes directly to the school, but the ultimate beneficiary is the "exceptional" child. That the state chooses a private institution as its instrumentality does not despoil the public nature of the appropriation, for it has been said "that the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or is not;

that the appropriation is not made for the agency, but for the object which it serves; the test is in the end, not in the means. The limitation put upon the state government by the people is as to what things it may collect taxes from them for, to which it may apply their property through taxation; not upon the means by which or through which it will do it." Hager v. Kentucky Children's Home Soc., 1904, 119 Ky. 235, 83 S.W. 605, 608, 67 L.R.A. 815.

There is, of course, the risk that in individual instances the payment of $100 per pupil will help the operators of the school without any perceptible increase in benefits to the children. That some of the seeds of public assistance will fall on barren ground is always possible. However, the proper safeguard rests in the regulatory power and responsibility of the state board of education.

Though public aid chiefly benefits a certain class, if its ultimate purpose is to contribute to the welfare of the people of the whole state, it does not constitute a special privilege or emolument within the meaning of Const. § 3. Carman v. Hickman County, 1919, 185 Ky. 630, 215 S.W. 408; Bowman v. Frost, 1942, 289 Ky. 826, 158 S.W.2d 945. Nor does it violate Const. § 171. (Carman v. Hickman County, supra) or Const. § 177 (Hager v. Kentucky Children's Home Soc., supra).

We have no difficulty in concluding that the act does have a valid public purpose within the scope and spirit of Const. §§ 3, 171 and 177.

■ As to the question of classification, it was held in the Hager case, supra, that an act for the benefit of homeless destitute children of the commonwealth generally was not local or special legislation under Const. § 59 even though one agency was selected for that purpose. In Bowman v. Frost, 1942, 289 Ky. 826, 158 S.W.2d 945, it was held, in effect, that when the legislature in singling out a special class responds to a moral duty of the state it does

no violence to Const. § 3. See also Meredith v. Ray, 1942, 292 Ky. 326, 166 S.W.2d 437. "That some members of the public may derive more benefit than others, even between those who are situated alike or in the same class, is immaterial where the chief function of the expenditure is to minister to the public good * * *." Hendrickson v. Taylor County Farm Bureau, 1922, 196 Ky. 75, 244 S.W. 82, 84. We think that exceptional children, for whose education the common schools are not adequate, are a proper subject of classification.

■ There is, however, in this law another classification which has not been questioned but has been considered by us and ought to be mentioned. The public assistance is confined to schools engaged in the education of exceptional children at the time of the enactment. Hence children who may attend other similar schools established thereafter will not have the same benefit. No doubt, however, the legislature wished to forfend against a mushrooming of new "schools" attracted more by the state aid than by a genuine desire to serve. Probably most of the existing schools are charities, and, if so, it is well that things be kept that way.

Classifications based upon time or existing conditions frequently have been upheld. In Hines v. Jenkins, 1929, 237 Ky. 676, 36 S.W.2d 387, it was held that a city, after permitting 51 gasoline pumps to be installed on its sidewalks, could validly refuse to permit any more. In Opinion of the Justices, 1954, 99 N.H. 505, 105 A.2d 924, the Supreme Court of New Hampshire sustained a legislative action restricting commercial enterprises on a limited access toll road to those already so established. And as we have seen, in Hager v. Kentucky Children's Home Soc., 1904, 119 Ky. 235, 83 S.W. 605, 67 L.R.A. 815, the public aid was confined to a single institution. Hence we cannot say that the restriction to existing schools already performing the type of service in question is unreasonable.

Insofar as it is pertinent to the question now before us, Const. § 184 provides: "No sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal voters," etc. § 186 directs that all money "accruing to the school fund" be used exclusively for the maintenance of the public schools.

Although Const. § 184 literally applies only to funds "raised or collected" for education, this was held in Pollitt v. Lewis, 1937, 269 Ky. 680, 108 S.W.2d 671, 672, 113 A.L.R. 691, to be "a limitation upon legislative power to *expend money* for education other than in the common schools." (Emphasis added.) And in Talbott v. Kentucky State Board of Education, 1932, 244 Ky. 826, 52 S.W.2d 727, under the same principle it was held that any funds raised by taxation become a part of the school fund as soon as they are appropriated for school purposes.

Whether the theory of the Pollitt and Talbott cases really is justified by the language of Const. §§ 184 and 186 is questionable. See, for comparison, dictum in the later case of Hodgkin v. Board for Louisville & Jefferson County Children's Home, Ky.1951, 242 S.W.2d 1008, 1010, to the effect that these sections neither authorize appropriations of the "Common School Fund" to schools outside the common school system *"nor do they bar the use of other state funds for such schools."* (Emphasis added.) See also Jefferson County Board of Education v. Goheen, 1948, 306 Ky. 439, 207 S.W.2d 567, 569. However, we do not find it necessary to come to grips with that problem in this case, because we regard the act in question as primarily a welfare rather than an educational measure. For example, it would scarcely be argued that the state could not, if it saw fit, provide crutches for the crippled or seeing eye dogs for the blind. That the public assistance takes the particular form of education makes no difference. Otherwise it would be doubtful that such institutions as the Kentucky Industries for the Blind (KRS 163.036), Mayo State Vocational School (KRS 163.090) and Northern Kentucky State Vocational School (KRS 163.100) could be supported or operated by the state, because certainly they are not within the common school system. We do not believe it was the intention of the delegates in adopting Const. §§ 184 and 186 to deny forever the possibility of special educational assistance to those who by no choice of their own are unsuited to the standard program and facilities of the common school system.

Probably the most difficult problem in this case is the question of whether the legislature over-delegated its powers in failing to prescribe more definite standards to be observed by the administrative agency in determining the eligibility of and regulating the recipient schools. Our decisions and those of the other courts of last resort in this country are replete with mention of "standards," much of which has been characterized by a leading authority as mumbo-jumbo. Kenneth Culp Davis, Administrative Law Treatise, § 22.11 (Vol. 1, p. 125). A perusal of the latter work, and, in particular, Vol. 1, Chapter 2, "Delegation of Power," pp. 75–158, will convince the reader that "The need is usually not for standards but for safeguards." Ibid., p. 151. We quote from it as follows:

"The typical opinion of a state court on a delegation problem is quite unfortunate both in what it says and what it fails to say. It says that (1) legislative power may not be delegated, (2) that 'filling up the details' is not an exercise of legislative power, (3) that legislative power is not delegated if the Legislature has laid down a standard to guide the exercise of the power, and (4) that presence or absence of vague verbalisms like 'public interest' or 'just and reasonable' make all the difference between valid legislation and unlawful delegation.

"The typical state court opinion on delegation fails to say anything about (1) the reasons for the legislative

choice to make the particular delegation, (2) the practical consequences of allowing the Legislature to do what it is trying to do, (3) the usual lack of practical advantage in compelling the Legislature to dress up the statute with vague verbiage that the judges call standards, (4) the question whether in the circumstances good government calls for a headlong choice of policy by the legislative body or whether it requires the working out of policy by case-to-case adjudication conducted by those who have the advantage of knowing the facts of particular cases, (5) the need for protection against unfairness, arbitrariness, and favoritism, (6) the importance of procedural safeguards, or opportunity for a judicial check, and in some circumstances of a proper legislative or even administrative supervision or check, or (7) the need for providing help to the Legislature in its search for practical and efficient ways of accomplishing legislative objectives. * * * The notion that a standard should be required started out rationally; the belief was that the legislative body ought to state an 'intelligible principle' and that the administrative authority would merely 'fill in the details.' * * * The difficulty is that it is often affirmatively desirable for the legislative body to avoid either an intelligible principle or a clear delineation of the general policy, for the simple reason that many questions of basic policy may better be worked out by an agency than by a legislative body." Ibid., pp. 148–149.

In the study from which we have quoted it is further demonstrated, by numerous examples from this and other courts, that in order to find the effective law "one must look past the theory to the holdings. The correlation between the theory and the holdings is characteristically low, and when it is high the holdings have been unfortunate when examined in the light of practical needs of effective government." Ibid., pp. 103–104.

Let us, then, examine this law in terms of the practical needs of effective government, and in terms of safeguards against abuse and injustice. The legislature wants to encourage and lend a modicum of support to the special education of a certain class of people. It does not wish, in so doing, to waste the taxpayers' money. The members of the legislature are allowed to meet in regular session only 60 days every two years. They have neither the time, facilities, nor qualifications to do more than indicate the class and fix the amount to be spent. At the state's disposal, however, is its board of education, an agency fully and better qualified than the legislature to establish and carry out whatever further policies and procedures may be necessary or desirable. This body also is one of the most responsible and long-established agencies of the state government. Is there any real danger that it would, even if it could, abuse the responsibilities conferred upon it by this act? We think not. Moreover, since arbitrary power does not exist in this Commonwealth, any discriminatory treatment is inherently reviewable by the courts. Cf. 73 C.J.S. Public Administrative Bodies and Procedure § 164, pp. 506–507; Davis, Administrative Law Treatise, § 28:21, Vol. 4, pp. 112–113.

This act does not, in our opinion, constitute an invalid delegation of legislative authority under Const. §§ 27 and 28. See Craig v. O'Rear, 1923, 199 Ky. 553, 251 S.W. 828, 834, sustaining the right of the legislature to vest the "management and control" of two state normal schools in the state board, and citing other illustrative instances of valid delegation.

⬛ We come lastly to the question of whether the act permits public funds to be used by sectarian or denominational schools in violation of Const. § 189. It so happens that the schools involved in this lawsuit are nonsectarian charities, but the term "private

schools," of course, admits of no such limitation. Literally it would appear to mean any school outside the common school system. However, we may properly indulge the presumption that the legislature did not intend to include schools to which the payments could not legally be made. It is not unreasonable to presume, for example, that the term was not meant to include schools not within the state, and it is equally reasonable to infer that it does not include schools that give sectarian instruction or have any denominational requirements with respect to their teachers or pupils. It is to be expected that the board of education in establishing and administering uniform standards and regulations determining eligibility will heed the Constitution. Hence we find in the act no violation or attempted authorization of the board to violate Const. § 189.

The judgment is affirmed.

MONTGOMERY, J., dissents.