# Supreme Court of Kentucky

2021-SC-0444-DG

MARION HUGHES; JAMES A. CRUME;                    APPELLANTS
PHILLIP L. WESTERN; RAYMOND S.
BATTS; AND TERRI A. ROGERS


                    ON REVIEW FROM COURT OF APPEALS
V.                        NO. 2019-CA-1457
            JEFFERSON CIRCUIT COURT NO. 07-CI-009996


UPS SUPPLY CHAIN SOLUTIONS, INC.;                    APPELLEES
UNITED PARCEL SERVICE, INC.


### <u>ORDER DENYING PETITION FOR REHEARING</u>

The Petition for Rehearing, filed by the Appellants, of the Opinion of the
Court, rendered March 23, 2023, is DENIED.

On the Court's own motion, however, the Opinion of the Court, rendered
on March 23, 2023, is modified and the Opinion of the Court is hereby
ORDERED SUBSTITUTED for the Opinion originally rendered. The modification
does not affect the holding of the original Opinion.

All sitting.  VanMeter, C.J., and Bisig, Conley, Keller, and Nickell, JJ.,
concur. Lambert and Thompson, JJ., dissent and would grant the petition for
rehearing.

ENTERED: August 24, 2023.


                                        _____
                                        CHIEF JUSTICE

# Supreme Court of Kentucky

2021-SC-0444-DG

MARION HUGHES; JAMES A. CRUME;                    APPELLANTS
PHILLIP L. WESTERN; RAYMOND S.
BATTS; AND TERRI A. ROGERS


|   | ON REVIEW FROM COURT OF APPEALS |
|---|---|
| V. | NO. 2019-CA-1457 |
|   | JEFFERSON CIRCUIT COURT NO. 07-CI-009996 |


UPS SUPPLY CHAIN SOLUTIONS, INC.;                    APPELLEES
UNITED PARCEL SERVICE, INC.


**OPINION OF THE COURT BY CHIEF JUSTICE VANMETER**

**<u>AFFIRMING</u>**

In matters of statutory construction, courts have the duty to ascertain and give meaning to the intent of the legislature. In this case, our task is to determine whether KRS[1] Chapter 337 encompasses the federal Portal-to-Portal provisions such that preliminary and postliminary activities, such as undergoing security screens, are non-compensable. Under customary rules of statutory construction, we hold that such activities are non-compensable and therefore affirm the Court of Appeals and the Jefferson Circuit Court.

---

[1] Kentucky Revised Statutes.

## I.    Factual and Procedural Background.

This action was filed back in 2007 as a wage-and-hour class action by Marion Hughes[2] against UPS Supply Chain Solutions and United Parcel Service, Inc.[3]  The complaint alleged that UPS violated KRS Chapter 337 by failing to compensate Class Members for time spent complying with mandatory security procedures upon entering/exiting UPS facilities.  The allegations were that Class Members expended work time on (i) entering after complying with mandatory entry security procedures and before being permitted to clock-in and (ii) exiting after being required to clock-out and then complying with mandatory exit security procedures.  The Class Members refer to this uncompensated time as "security time."

The long procedural history of this case is not particularly germane to the issue before us, since, as noted, that issue is one of statutory construction. Suffice to say that this case spent some time in the federal courts on UPS's attempt to remove it there,[4] and then back in state court on whether it would

---

[2] By First Amended Complaint and Second Amended Complaint, James A. Crume, Phillip L. Western, Raymond S. Batts, and Terri A. Rogers were added as plaintiffs.  We refer to the named plaintiffs and other members of the class as "Class Members."

[3] We refer to the defendants jointly as "UPS."

[4] *Hughes v. UPS Supply Chain Sols., Inc.*, No. 3:07-CV-605-S, 2008 WL 3456217 (W.D. Ky. Aug. 8, 2008) (denying federal diversity jurisdiction), *denying permission to appeal, In re UPS Supply Chain Sols., Inc.*, No. 08-0513, 2008 WL 4767817 (6th Cir. Oct. 27, 2008); *Hughes v. UPS Supply Chain Sols., Inc.*, No. 3:09-CV-576-S, 2010 WL 1257724 (W.D. Ky. Mar. 26, 2010) (denying second attempt at removal for federal diversity jurisdiction); *Hughes v. UPS Supply Chain Sols., Inc.*, 815 F. Supp.2d 993 (W.D. Ky. 2011) (granting employees' motion to remand to state court for employer's waiver of Labor Management Relations Act's claims).

proceed as a class action.[5]  Ultimately, the Court of Appeals affirmed the trial

court's order certifying the class.  *UPS Supply Chain Sols., Inc. v. Hughes*, No.

2014-CA-1496-ME, 2018 WL 3602262 (Ky. App. July 27, 2018).

Following the Court of Appeals' opinion affirming the trial court's class

certification, UPS moved for judgment on the pleadings, arguing that "the time

for which the Class was seeking compensation – time spent waiting for and

undergoing security screenings – was not compensable under Kentucky law[]"

based on the Portal-to-Portal Act, 29 U.S.C.[6] §§ 251-262, and federal and

Kentucky case law interpreting the federal Fair Labor Standards Act, 29 U.S.C.

§§ 201- 219, the Portal-to-Portal Act and KRS Chapter 337.  The Class

Members' response was that because KRS Chapter 337 did not include

language tracking the provisions of the Portal-to-Portal Act, specifically 29

U.S.C. § 254,[7] our legislature had elected not to include those provisions and

---

[5] *Hughes v. UPS Supply Chain Sols., Inc.,* No. 2012-CA-001353-ME, 2013 WL 4779746 (Ky. App. Sept. 6, 2013) (reversing denial of class certification and remanding for additional consideration under Kentucky Rules of Civil Procedure ("CR") 23). Under CR 23.06, "[a]n order granting or denying class action certification is appealable[.]"

[6] United States Code.

[7] 29 U.S.C. § 254(a) sets forth general exemptions from compensable time:

(a) Activities not compensable

Except as provided in subsection (b), no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947--

therefore they were inapplicable.  The trial court granted UPS's motion and the Court of Appeals affirmed.  We granted the Class Members' motion for discretionary review.

## II.    Standard of Review.

In this case, the trial court granted UPS's motion for partial judgment on the pleadings.  CR 12.03.  A motion for judgment on the pleadings "should be granted if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief."  *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 585 (Ky. 2021); *City of Pioneer Vill. v. Bullitt Cnty. ex rel. Bullitt Fiscal Ct.*, 104 S.W.3d 757, 759 (Ky. 2003). Such motions are "based purely on whether the plaintiff has stated a cause of action as a matter of law and do not require or permit the trial court to make any findings of fact." *Mosley*, 626 S.W.3d at 585 (footnote omitted).  Because a trial court's ruling on a motion for judgment on the pleadings is a question of law, appellate review of

---

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

4

a judgment on the pleadings is de novo. *Id.* (footnote omitted). Thus, we afford no deference to the lower court's opinions or rulings. *Id.* Similarly, we interpret statutes without deferring to lower courts' interpretations. *Wheeler & Clevenger Oil Co. v. Washburn,* 127 S.W.3d 609, 612 (Ky. 2004).

### III.    Analysis.

The issue presented is one of statutory construction, i.e., whether the Portal-to-Portal exceptions are contained within Kentucky's wage and hour provisions.

In matters of statutory construction, "our goal, of course, is to give effect to the intent of the [legislature]." *Shawnee Telecom Res., Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky. 2011). To derive that intent, we look first to the statute's language, "giving the words their plain and ordinary meaning." *Pleasant Unions, LLC v. Ky. Tax Co.,* 615 S.W.3d 39, 45 (Ky. 2021); *see Shawnee Telecom,* 354 S.W.3d at 551 (holding that intent is derived "from the language the [legislature] chose, either as defined by the [legislature] or as generally understood in the context of the matter under consideration[]"). "All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning." KRS 446.080(4). If the statutory language is plain and unambiguous, the legislature's intent is deduced from the language used. *W. Ky. Coal Co. v. Nall & Bailey,* 228 Ky. 76, 80, 14 S.W.2d 400, 401–02 (1929). On the other hand, if the language is ambiguous, we resort to rules of

5

interpretation to guide our determination of the legislature's intent. *Pleasant Unions*, 615 S.W.3d at 45; *MPM Fin. Group, LLC v. Morton*, 289 S.W.3d 193, 198 (Ky. 2009).

In this case, KRS Chapter 337 is ambiguous in that it does not define "work," and contains no provision which addresses, either way, whether preliminary or postliminary activities constitute compensable work or time on the job. We acknowledge that KRS Chapter 337 "protects employees from the unlawful wage and hour practices of their employer." *Mouanda v. Jani-King Int'l*, No. 2021-SC-0089-DG, 653 S.W.3d 65, 2022 WL 3641175, at *3 (Ky. Aug. 18, 2022). KRS 337.010(1)(c)1 defines "wages" to include "any compensation due to an employee by reason of his or her employment, including salaries, commissions, vested vacation pay, overtime pay, severance or dismissal pay, earned bonuses, and any other similar advantages agreed upon by the employer and the employee or provided to employees as an established policy." An "employee," with exceptions not applicable to this case, is defined as "any person employed by or suffered or permitted to work for an employer[.]" KRS 337.010(1)(e). KRS 337.275 defines "minimum wage," but that provision does not specifically help our interpretation in this case. And, finally, and perhaps most pertinently, "any employer who pays any employee less than wages and overtime compensation to which such employee is entitled under or by virtue of

6

KRS 337.020 to 337.285 shall be liable to such employee affected for the full amount of such wages and overtime compensation[.]" KRS 337.385(1).[8]

To resolve this ambiguity, we are guided by both state administrative interpretation and federal case law. We discuss each in turn.

### A. State Administrative Interpretation of KRS Chapter 337.

The legislature has empowered the Kentucky Labor Cabinet, specifically the Kentucky Department of Workplace Standards, to issue administrative regulations "defining and governing" KRS Chapter 337. *See* KRS 337.295. Those agencies enjoy "wide discretion" in interpreting Kentucky law. *Ky. Mun. League v. Commonwealth Dep't of Labor*, 530 S.W.2d 198, 201–02 (Ky. App. 1975) (citing *Butler v. United Cerebral Palsy of N. Ky., Inc.*, 352 S.W.2d 203 (Ky. 1961)). And the Department of Workplace Standard's administrative interpretation of Kentucky law serves as a basis for the application of Kentucky statutes. *See City of Louisville, Div. of Fire v. Fire Serv. Managers Ass'n ex rel. Kaelin*, 212 S.W.3d 89, 92–93, 96 (Ky. 2006).

For nearly half a century, the Kentucky Department of Workplace Standards has concluded that the Portal-to-Portal Act's compensation limits are part of the KRS Chapter 337 framework.[9] *See* 803 KAR 1:065 (LAB-12; 1 Ky. R. 253; eff. 1-8-75; TAM eff. 8-9-2007; expired 3-1-2020). For instance,

---

[8] This lack of specificity is underscored by the Class Members' second amended complaint which cites no specific statute or regulation, but merely alleges "UPS has violated Kentucky's wage and hour laws and regulations."

[9] Kentucky's current regulation regarding hours worked is codified at 803 Ky. Admin. Regs. ("KAR") 1:067 (48 Ky. R. 2336, 2980; eff. 8-30-2022).

Kentucky's longstanding administrative regulation regarding "Travel Time"

stated:

> (1)  General.  The principles which apply in determining whether or not time spent in travel is working time depend upon the kind of travel involved.
>
> (2)  Home to work.  An employe[e] who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment.  This is true whether he works at a fixed location or at different job sites.  Normal travel from home to work is not worktime.
>
> (3)  Travel that is worktime.  *Time spent by an employe[e] in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked.*  Where an employe[e] is required to report at a meeting place to receive instructions or to perform other work there, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked.

803 KAR 1:065 (emphasis added).

And although the earlier regulation, 803 KAR 1:065, expired in 2020,

Kentucky's current regulation regarding "Hours Worked" expressly

incorporates federal standards into the definition of "Travel Time," stating,

"Travel Time.  The requirements for travel time applicable to KRS 337.275 and

337.285 shall be as established in 29 C.F.R.[10] 785.33, 785.35, 785.38, and

785.39."  803 KAR 1:067(7).[11]

---

[10] Code of Federal Regulations.

[11] The language in 29 C.F.R. 785.38, which is incorporated by reference in 803 KAR 1:067(7), is identical to the relevant language in Kentucky's previous regulation regarding travel time.  *Compare* 803 KAR 1:065 (1975) ("[t]ime spent by an employe[e] in travel as part of his principle activity, such as travel from job site to job site during the workday, must be counted as hours worked[]"), *with* 29 C.F.R. 785.38 ("[t]ime spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked[]").

8

"Both the phrase and concept of a 'principal activity' are taken from the text of the Portal-to-Portal Act." *Vance v. Amazon.com, Inc. (In re Amazon.com, Inc., Fulfillment Ctr. Fair Lab. Standards Act (FLSA) & Wage & Hour Litig.)*, 852 F.3d 601, 613 (6th Cir. 2017) (citing 29 U.S.C. § 254(a)). Inclusion of the "principal activity" language in Kentucky's administrative regulations strengthens the connection between KRS Chapter 337 and the Portal-to-Portal Act, "which has employer liability for 'walking, riding [and] traveling to and from the actual place of performance' squarely at its focus." *Id.* (quoting 29 U.S.C. § 254(a)(1)).

Furthermore, Kentucky's wait-time regulation, 803 KAR 1:063,[12] imports the Portal-to-Portal Act rule and is drawn from federal regulations, *see* 29 C.F.R. §§ 785.14–16. *Id.* "Both sets of regulations explain that 'waiting is an integral part of the job' only when the employee is 'engaged to wait'—meaning his workday has begun and he is anticipating some further principal activity, such as a stenographer waiting to take dictation or a firefighter waiting for a call." *Id.* (citing 803 KAR 1:065(3)(2) and 29 C.F.R. § 785.15).

The longstanding similarities between KRS Chapter 337's administrative regulations and their federal counterparts bolsters the conclusion that the Portal-to-Portal Act's exemptions apply to KRS Chapter 337. Under Kentucky law, administrative regulations have the full force and effect of law when duly enacted and consistent with enabling legislation. *Centre College v. Trzop*, 127

---

[12] Although the previous version of 803 KAR 1:063 has expired, similar language has been recodified at 803 KAR 1:064.

S.W.3d 562, 566 (Ky. 2003).  As a result, even considering legislative silence on the issue, the Portal-to-Portal Act's exemptions have been Kentucky law by way of administrative regulation since 1975.

Moreover, legislative inaction here supports the conclusion that KRS Chapter 337 imports the Portal-to-Portal Act's exemptions.  The legislature has convened in regular session over thirty times since the Kentucky Department of Workplace Standards first incorporated the Portal-to-Portal Act's exemptions into KRS Chapter 337.[13]  As will be discussed in more detail *infra*, the legislature has not been shy about amending other parts of KRS Chapter 337.  Legislative inaction under these circumstances demonstrates that the legislature has ratified, or at the very least has acquiesced, in the Department of Workplace Standard's inclusion of the Portal-to-Portal Act's exemptions in the KWHA framework.

### B. Federal Court Interpretation of KRS Chapter 337.

In *Kaelin,* we described KRS Chapter 337 as "Kentucky's analogue to the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 [("FLSA")]."  212 S.W.3d at 92.  As such, "[w]e first look to Kentucky jurisprudence and find nothing other than the statutes themselves to aid in interpreting the issue which is presented before us today.  In the absence of any Kentucky cases on point, we next look to federal cases interpreting the FLSA."  *Id.* at 95.

---

[13] Before 2000, the Kentucky General Assembly met in regular sessions in even-numbered years.  In 2000, Kentucky established annual regular sessions through constitutional amendment.  *See* Ky. Const. § 36 (2000).

Two federal cases directly aid our interpretation. First, the United States Supreme Court held, in *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27 (2014), that security screenings are noncompensable activities under the FLSA since such screenings were not the principal activity or activities which the employee is to perform, *id.* at 35 (citing 29 U.S.C. § 254(a)(1)), and were not "'integral and indispensable' to the employees' duties as warehouse workers." *Id.* The Court noted that "[t]he screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment. And [the employer] could have eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.*

Following this decision, the Sixth Circuit Court of Appeals applied the *Integrity Staffing* rationale to a case involving a similar requirement for workers to pass through lengthy anti-theft security screenings after clocking out without compensation for that time. *Vance*, 852 F.3d 601. In *Vance*, the court, following a thorough analysis of the history of FLSA, the Portal-to-Portal Act, KRS Chapter 337 and applicable federal and state regulations, concluded that KRS Chapter 337 incorporates "the Portal-to-Portal Act's compensation limits on preliminary and postliminary activities. *Integrity Staffing* is therefore on point." 852 F.3d at 615.

The Class members argue that this Court, and not the federal courts, are the final arbiters of Kentucky law. While that assertion is true, the Class Members forget that we are not interpreting statutes for our benefit. Rather,

11

our goal, as stated previously, is to ascertain and give effect to the legislature's intention. *See* KRS 446.080(1).

While we agree with the Sixth Circuit's analysis as to the Portal-to-Portal Act's applicability to KRS Chapter 337, another consideration mandates its application. We have often cited the rule of statutory interpretation that "the failure of the legislature to change a known judicial interpretation of a statute is extremely persuasive evidence of the true legislative intent." *Bloyer v. Commonwealth*, 647 S.W.3d 219, 225 (Ky. 2022); *Kindred Healthcare v. Harper*, 642 S.W.3d 672, 684 (Ky. 2022); *Toyota Motor Mfg., Ky., Inc. v. Prichard*, 532 S.W.3d 633, 636 (Ky. 2017); *Hughes v. Commonwealth*, 87 S.W.3d 850, 856 (Ky. 2002); *Rye v. Weasel*, 934 S.W.2d 257, 262 (Ky. 1996). In other words, "a strong implication [is created] that the legislature agrees with a prior court interpretation of its statute when it does not amend the statute interpreted." *Kindred*, 642 S.W.3d at 684; *Toyota*, 532 S.W.3d at 636; *Rye*, 934 S.W.2d at 262. This rule of statutory interpretation equally applies when a federal court exercising diversity jurisdiction interprets state statutes. *See Democratic Party v. Graham*, 976 S.W.2d 423, 428-29 (Ky. 1998) (holding, in light of a prior federal decision interpreting KRS Chapter 121 and subsequent legislative reenactment, "the legislature is well aware of the interpretation of the existing statute and has adopted that interpretation unless the new law contains language to the contrary. . . . If the legislators intended to depart from the existing statutory interpretation, it is incumbent that they use 'plain and unmistakable language[.]'") (internal citations omitted).

12

In this case, after the Sixth Circuit's 2017 decision in *Vance*, the Kentucky General Assembly has convened five times. It has passed statutory amendments to KRS Chapter 337 in 2018, 2019, 2020 and 2021.[14] Admittedly some of these amendments do not implicate any of the sections at issue in this case. But these amendments indicate that the legislature has been proactive in amending KRS Chapter 337. Furthermore, notwithstanding that some of the issues in this case arose more than fifteen years ago, the legislature may make legislation retroactive, if it so desires. *See* KRS 446.080(3) (providing that "[n]o statute shall be construed to be retroactive, unless expressly so declared[]"); *Peabody Coal Co. v. Gossett*, 819 S.W.2d 33, 36 (Ky. 1991) (holding that remedial statutes may have retroactive application).

## IV. Conclusion.

At bottom, the Portal-to-Portal Act's exemptions were incorporated into Kentucky law in 1975, when the Department of Workplace Standards applied the Portal-to-Portal Act's exemptions to KRS Chapter 337. Nearly a half century of legislative inaction clearly demonstrates that the legislature has acquiesced to the Department's administrative interpretation. In addition, a federal case, *Vance*, addressed a virtually identical factual situation and

---

[14] Act of Apr. 20, 2022, ch. 236 § 115, 2022 Ky. Acts 2216 (amending KRS 337.010); *Id.* ch. 236 § 176 (amending KRS 337.065); *Id.* ch. 236 § 116 (amending KRS 337.075); Act of Apr. 8, 2022, ch. 94 § 3, 2022 Ky. Acts 566 (amending KRS 337.100); Act of Apr. 12, 2022, ch. 191 § 9, 2022 Ky. Acts 1117 (amending KRS 337.285); Act of Mar. 29, 2021, ch. 153 § 1, 2021 Ky. Acts 883 (amending KRS 337.010); Act of Mar. 23, 2021, ch. 76 § 1, 2021 Ky. Acts 412 (amending KRS 337.015); Act of Feb. 11, 2020, ch. 2 § 1, 2020 Ky. Acts 5 (amending KRS 337.010); Act of Apr. 26, 2018, ch. 195 § 1, 2018 Ky. Acts 1671 (amending KRS 337.285).

applied the Portal-to-Portal Act's exemptions to KRS Chapter 337. A contrary interpretation would be squarely inconsistent with well-settled law concerning the legal force of properly enacted administrative regulations, this Court's precedent regarding the proper application of legislative inaction, and accepted principles of statutory interpretation. For these reasons, the decisions of the Court of Appeals and the Jefferson Circuit Court holding that preliminary and postliminary security screenings required by UPS are not compensable under KRS Chapter 337 are affirmed.

All sitting. VanMeter, C.J.; Bisig, Conley, and Nickell, JJ., concur. Thompson, J., dissents by separate opinion in which Keller and Lambert, JJ., join.

THOMPSON, J., DISSENTING: This protracted class action litigation currently concerns whether Kentucky will adopt the federal law contained in 29 United States Code (U.S.C.) § 254, known as Section 4 of the Portal-to-Portal Act (the Federal Law), and engraft it into our Wage and Hour law. The Federal Law exempts from compensation "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and . . . activities which are preliminary to or postliminary to said principal activity or activities," if they occur prior or subsequent to the performance of the employee's "principal activity or activities." 29 U.S.C. § 254(a).[15] If we adopt the Federal Law, the question then

_____

[15] The relevant portion of the Federal Law is contained in 29 U.S.C. § 254(a) which explains that the following activities are *not* compensable:

becomes what impact this will have on UPS workers in the class who must undergo extensive and potentially lengthy security screenings at the beginning and end of their shifts as mandated by federal laws applicable to package shipping companies.

The majority opinion declares that that the Federal Law has already been incorporated into our Wage and Hour regulations, and determines that as a matter of law, it creates a bright-line rule prohibiting compensation for *any* type of security screenings. Accordingly, the majority opinion declares that such workers must be summarily denied any compensation for the time they spend passing through security. The majority opinion thereby concludes that under any set of facts, no matter how onerous and time-consuming such screenings are or why they are required, employees are required to bear this cost of business themselves.

I vehemently disagree with such an approach. I respectfully dissent from the majority opinion as I cannot agree with its reasoning that UPS's motion for

---

(1) walking, riding, or traveling to and from the actual place
    of performance of the principal activity or activities
    which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to
    said principal activity or activities,

which occur either prior to the time on any particular workday at which
such employee commences, or subsequent to the time on any particular
workday at which he ceases, such principal activity or activities . . . .

29 U.S.C. § 254(b) provides enumerated exceptions based on contract and custom to the 29 U.S.C. § 254(a) restrictions to compensation, limited by 29 U.S.C. § 254(c), but I do not discuss these exceptions as they are inapplicable to the facts before us.

15

partial judgment on the pleadings[16] was properly granted pursuant to the Kentucky Rules of Civil Procedure (CR) 12.03, given the incomplete record available and the absence of adequate discovery. The majority opinion is wrongfully engrafting the Federal Law into Kentucky's Wage and Hour laws and then interpreting this law expansively to resolve a question that it is premature to address.

I conclude that under Kentucky's own standards or the Federal Law that this case should have survived the motion for judgment on the pleadings and should be reversed and remanded for development of the record. It is well past time for this matter, which was originally filed in 2007, to be decided on the merits.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The class is composed of UPS workers employed at the Worldport, Elizabethtown, and Louisville Technical & Logistics Center (LTLC) facilities as they were determined to have security procedures and methods in common. *Hughes v. UPS Supply Chain Sols., Inc.*, 2012-CA-001353-ME, 2013 WL 4779746, at *5-7 (Ky. App. Sept. 6, 2013) (unpublished).

The class members generally alleged that they were not being appropriately compensated for mandatory worktime which consisted of entering and exiting through a security checkpoint, as they could not clock in

---

[16] The partial summary judgment on the pleadings fully dismissed the class's claims for unpaid wages for all time worked; it did not address the class's claims for illegal disability leave policies, which are apparently still pending.

until after entering through a security checkpoint and then had to clock out before exiting through a security checkpoint. They alleged that the time spent going through the security checkpoints was for the benefit of UPS and was uncompensated worktime, which was not *de minimis*, explaining that "Plaintiffs were not free to effectively use the time expended between complying with security and clocking-in or out for their own purposes." Accordingly, they generally alleged that UPS violated Kentucky's Wage and Hour laws and regulations.

I focus my discussion on the security screening processes that take place for the portion of the class that works at UPS's Worldport facility. Some pertinent information is needed to understand the size and scale of the Worldport facility to put into perspective the limited information we have as to what its security screening process entails:

**UPS WORLDPORT**[17]

---

[17] The data contained in this chart was gleaned from the following sources: Louisville Regional Airport Authority, *Aviation Statistics: December 2022*, https://www.flylouisville.com/wp-content/uploads/2023/02/Aviation-Stats-2022-12-revised-3.pdf; UPS, *UPS Air Operation Facts* (Revised Jun. 30, 2022), https://about.ups.com/content/dam/upsstories/assets/fact-sheets/airlines-fact-sheets/Air-Operations-Facts-063022.pdf; AeroSavvy, *Inside Louisville's UPS Worldport*, https://aerosavvy.com/ups-worldport/ (last visited Feb. 28, 2023) (*Inside Worldport*); Louisville Regional Airport Authority, SDF History, https://www.flylouisville.com/corporate/sdf-history/ (last visited Feb. 23, 2023); Louisville Regional Airport Authority, *Economic Impact: Fueling the Regional Economy*, https://www.flylouisville.com/wp content/uploads/2020/10/LRAA-CY2018-Economic-and-Fiscal-Impact-2-Pager.pdf (last visited Feb. 23, 2023); UPS, *UPS Welcomes New Developments in Healthcare and Aviation* (Nov. 18, 2022), https://about.ups.com/us/en/our-stories/customer-first/ups-breaks-ground-on-louisville-expansions.html. I recognize that Worldport has expanded greatly since the class filed suit, so this data is not necessarily accurate for the time period at issue, but I provide it nevertheless as our decision will affect how employees at Worldport are compensated going forward.

17

| Size | • 5.2 million square feet (the size of 90 football fields) <br><br> • 7.2 miles around its perimeter <br><br> • Larger than Minneapolis's Mall of America <br><br> • ramp size of 300 acres |
|------|------|
| Capacity | • 125 aircraft parking spots <br><br> • 70 self-parking docks <br><br> • 387 in/outbound flights per day <br><br> • Peak capacity of one aircraft arriving each minute |
| Volume | • 416,000 packages/documents per hour <br><br> • 2 million packages a day (up to 4 million during the Christmas season) |
| Relative Importance | • UPS's largest facility and company's main air hub. <br><br> • second busiest cargo airport in North America <br><br> • fourth busiest cargo airport in the world |
| Workers | • 12,000+ employees work there per day |
| Statistics for 2022 | • 3+ billion pounds of cargo enplaned and deplaned (3,443,107,204 lbs enplaned; 3,249,700,296 lbs deplaned) <br><br> • 47,365 planes landed |

This publicly available information shows that this is a massive facility with a population and footprint that is equivalent to some smaller Kentucky cities.[18] A workplace at such a scale is difficult to imagine.

At this juncture of the litigation, our knowledge about the security screening process at Worldport and the other facilities is limited.[19] However, considering this and my general knowledge that Worldport is at the airport and that its employees are working in a facility that has package distribution that is loaded and unloaded from airplanes, the security screening process appears to be closely analogous to the airport security screenings that passengers undergo

---

[18] For comparison, the number of employees present every day, about 12,000, makes Worldport's "population" slightly smaller than Kentucky's 33rd largest city, Bardstown, which has a population of 14,028, but around the same size as Kentucky's 36th largest city, Somerset, which has a population of 12,143. World Population Review, *Cities in Kentucky by Population,* https://worldpopulationreview.com/states/cities/kentucky (last visited Feb. 28, 2023).

[19] *Hughes*, 2013 WL 4779746, at *5 briefly recounts this process for the Worldport, LTLC and Elizabethtown facilities for purposes of determining if they met the requirements of commonality and typicality:

> Upon entering the Elizabethtown facility, employees removed personal items, passed through a metal detector, and presented any bags for search by security personnel. Upon exiting the Elizabethtown facility, employees again passed through a metal detector. Upon entering the LTLC facility, employees removed personal items, passed through a metal detector, and presented any bags for search by security personnel. Upon exiting the LTLC facility, employees again passed through a metal detector. Upon entering the Worldport facility, employees were required to pass through a metal detector and remove all personal belongings. If an audible alert sounded, the employee again passed through a metal detector and could be wanded by security personnel if another alert sounded. The employees at Worldport followed the exact same security procedure upon exiting the facility.

This summary appears to be derived from the May 4, 2012, affidavit of Domenic DiMauro, Jr., UPS's Air District Security Manager (DiMauro Affidavit) and the May 3, 2012, affidavit of Steve Hamm, UPS's North American Security Director (Hamm Affidavit).

before they can board commercial flights. There are even a similar number of employees and passengers being screened each day.[20] The main difference appears to be that Worldport employees must undergo this process on both ends of their shifts and they have a much farther distance to traverse than passengers.[21]

As our passenger screening time varies, I imagine theirs must as well. Just as passengers plan ahead for screening time and often arrive far earlier than is actually needed to pass through security so that they will not risk (or worry about risking) failing to make it to the gate on time, such employees likely also need to arrive substantially ahead of time to ensure they can clock in on time so as to avoid workplace discipline.

## II. THE JUDGMENT ON THE PLEADINGS SHOULD NOT HAVE BEEN GRANTED

From the pleadings, and the class certification process, it appears that the security screenings at Worldport differ substantially from those security screenings that have been deemed non-compensable under the Federal Law.

---

[20] Publicly available statistics are that the Louisville Muhammad Ali International Airport had more than 3.88 million passengers in 2022, which when divided by 365 days, provides an average of about 10,630 passengers per day. Louisville Muhammad Ali International Airport, *Louisville Muhammad Ali International Airport Marks Third Best Year in 2022* (Feb. 7, 2023), https://www .flylouisville.com /louisville-muhammad-ali-international-airport-marks-third-best-year-in-2022/. Thus, there are fewer daily passengers than Worldport's 12,000 daily employees.

[21] The passenger terminals are comprised of just 360,000 square feet. Louisville Muhammad Ali International Airport, *Louisville Muhammad Ali International Airport (SDF)*, https://www.flylouisville.com/corporate/louisville-muhammad-ali-international-airport-sdf/ (last visited Feb. 28, 2023). This makes the passenger terminals appear tiny next to Worldport. *Inside Worldport.* According to the DiMauro Affidavit, the Worldport employees enter through one of four security entrances or through the hanger. How much entering through these entrances may divert employees from proceeding directly to their assigned workstations is unclear.

Therefore, whether or not the Federal Law applies, disputed issues of fact should have precluded granting judgment to UPS on the pleadings.

> Under Kentucky Civil Rule 12.03, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The moving party "admits for the purposes of his motion not only the truth of all his adversary's well-pleaded allegations of fact and fair inferences therefrom, but also the untruth of all his own allegations which have been denied by his adversary." *Pioneer Vill. v. Bullitt Cnty.*, 104 S.W.3d 757, 759 (Ky. 2003) (citing *Archer*, 365 S.W.2d 727). Importantly, a motion for judgment on the pleadings should never be granted unless "it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief." *Id.* (citing *Spencer v. Woods*, 282 S.W.2d 851 (Ky. 1955)). Furthermore, as our predecessor Court stated, if "the pleadings raise any issue of material fact," then a judgment on the pleadings "should be denied." *La Vielle v. Seay*, 412 S.W.2d 587, 590 (Ky. 1966).

*Russell v. Johnson & Johnson, Inc.*, 610 S.W.3d 233, 240 (Ky. 2020). Joined to this basic premise is that fact that under notice pleading, claims need not be stated with precision and must be liberally construed. *Id.* at 241.

The entitlement to compensation is necessarily fact specific. However, very few of the facts have yet been established. While we generally know what type of security screening the employees go through, we do not have much information about how this process works in practice and how different employees are affected by it. We do not know how many employees are lined up to go through such screenings before or after their shifts begin, how many screening stations there are at each entrance, how long the wait time is to pass through such screenings, and how much this may vary between different

21

shifts, days and other factors.[22]  We do not know if the length of the delay in reaching a workstation is caused by the diverted path needed to pass through a screening station, compared to the wait to pass through the screening process.

The information we have about why employees are required to be subjected to these particular kinds of screenings is provided in affidavits from UPS's North America Security Director Hamm and UPS's Air District Security Manager DiMauro.  They indicate these screenings are mandated for UPS to comply with federal regulations from the Transportation Security Administration (TSA), which must approve its security program, the Drug Enforcement Administration (DEA), and the Food and Drug Administration (FDA).[23]  Hamm Affidavit; DiMauro Affidavit.  Additionally, UPS has chosen to

---

[22] The DiMauro Affidavit indicates that at the Worldport facility "[i]t takes most employees only a few seconds to pass through this security screening process." DiMauro does not clarify whether this means that employees essentially walk through security gates unimpeded and complete the entire security process in this length of time, or if they have to wait to be screened, but each individual screening is typically completed within a few seconds.  He also does not clarify how long a security screening may take if the metal detector alerts or a bag requires closer inspection and how that impacts employees waiting to be screened. The Hamm Affidavit, which addresses security at LTLC and Elizabethtown, indicates that security processing at LTLC and Elizabethtown typically only takes seconds, but that wait times to pass through security at LTLC can take up to two minutes (with those times varying by building), and that at Elizabethtown wait times can be up to four minutes during peak morning rush.  The employees alleged that their wait times were not *de minimis* but did not provide any affidavits about their individual experiences with wait times.  I note that these are all factual questions to be resolved below but whether such time must be compensated does not hinge on how long an activity takes.

[23] UPS is required by federal regulations to implement security protocols mandated by the TSA at its Worldport facility because UPS has entered into an agreement with the Louisville International Airport, making it responsible for the areas under its exclusive control.  DiMauro Affidavit.  Certain UPS facilities must also comply with DEA and FDA regulations to guard against theft and diversion of controlled substances.  Hamm Affidavit.  However, it is unclear from these affidavits

22

participate in the Customs-Trade Partnership Against Terrorism (C-TPAT), "a joint government-business initiative" which "requires member businesses involved with the import process to work with the U.S. Customs and Border Patrol (CBP) to assess, develop, and implement procedures that ensure tighter cargo and supply chain security," to be C-TPAT certified and validated. DiMauro Affidavit. Obtaining such status greatly benefits UPS as "[i]n return for implementing [the C-TPAT] security guidelines, C-TPAT partners receive expedited processing of their cargo into the United States." Hamm Affidavit; DiMauro Affidavit. Additionally, some of UPS's customers require certain levels of security as part of their contractual agreements with UPS. Hamm Affidavit.

Without further development of the record, it is unclear which of the Kentucky Department of Workplace Standards (KDWS) regulations most aptly apply to the security screenings at issue. It is also unclear whether such regulations would provide compensation for security time, or not.

Kentucky's Wage and Hour laws do not squarely address whether going through security checkpoints should be considered compensable worktime. The most that can be said at this juncture is, "it depends" as such inquiries are highly fact dependent. While our Court can interpret what our regulations say, we cannot say how these regulations apply to undetermined facts.

---

whether the Worldport, LTLC, and Elizabethtown facilities are governed by DEA and FDA regulations.

## III. THE FEDERAL LAW DOES NOT APPLY

The Federal Law exempts from wages "preliminary" and "postliminary" activities that are not the "principal activity or activities" of the employment. Kentucky's Wage and Hour laws and administrative regulations have never used the phrase "portal-to-portal" or used the terms "preliminary" and "postliminary" in relation to determining whether something is compensable work time. *See generally* 803 Kentucky Administrative Regulations (KAR) 1:065; 803 KAR 1:067. These terms are also unknown when it comes to employment law in Kentucky unless a claim is being made under the Federal Law.

The KDWS has not explicitly adopted the Federal Law in any form, and I firmly believe that the KDWS has not implicitly adopted it either. The only significant language our regulations, past and present, share with the Federal Law is the use of the term "principal activity." This term is only used once in all of 803 KAR 1:065, in Section 7(3), in the following sentence: "Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked." Our current administrative regulation pertaining to hours worked, 803 KAR 1:067, which was adopted in 2022 and incorporates specific sections of 29 C.F.R. 785 by reference, also only uses the term "principal activity" once, in 29 C.F.R. 785.38, stating "[t]ime spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked." For both regulations then, this

24

language is used to make such time compensable, rather than to exclude it from compensation as the term does in the Federal Law.

The sections of the federal regulations that the KDWS chose to adopt and failed to adopt through 803 KAR 1:067, also support my reasoning. The KDWS failed to adopt any section of 29 C.F.R. 785 which either clearly references the Federal Law, *see* 29 C.F.R. 785.9, 785.24 and 785.50 (extensively quoting from and interpreting the applicability of the Portal-to-Portal Act), or any provisions that reference it more discretely, *see* 29 C.F.R. 785.7, 785.26 and 785.34. The only C.F.R. section 803 KAR 1:067 adopts which even makes mention of the Federal Law, 29 C.F.R. 785.33, only does so in referring to another (unadopted) regulation, 29 C.F.R. 785.34.[24] 803 KAR 1:067 § 7 specifically declined to adopt 29 C.F.R. 785.34, while adopting the adjoining regulations of 29 C.F.R. 785.33, 785.35, 785.38, and 785.39. I believe such action indicates that there was never any prior intent to adopt or follow the Federal Law.

Accordingly, I strongly disagree with the majority opinion that our regulations, past and present, which contain the singular use of the term "principal activity" as detailed, *supra*, should be interpreted as an implicit adoption of the Federal Law with its concomitant elimination of time subject to compensation, as the Sixth Circuit did in *Vance v. Amazon.com, Inc. (In re*

---

[24] 29 C.F.R. 785.33 is a general regulation on travel time which states in full:

The principles which apply in determining whether or not time spent in travel is working time depend upon the kind of travel involved. The subject is discussed in §§ 785.35 to 785.41, which are preceded by a brief discussion in § 785.34 of the Portal-to-Portal Act as it applies to travel time.

*Amazon.com, Inc., Fulfillment Ctr. Fair Lab. Standards Act (FLSA) & Wage &*

*Hour Litg.)*, 852 F.3d 601, 613 (6th Cir. 2017). I additionally disagree with the majority opinion's assertion, which goes beyond the reasoning in *Vance*, that "[f]or nearly half a century, the Kentucky Department of Workplace Standards has concluded that the Portal-to-Portal Act's compensation limits are part of the KRS Chapter 337 framework."

The majority opinion's reliance on *Vance* for this proposition is misplaced. The Sixth Circuit in *Vance* specifically acknowledged that the litigants agreed that the question of whether the Kentucky Wage and Hours Act incorporates the Federal Law was unsettled; it implicitly agreed but chose not to certify such a question to our Court based on the advanced state of the litigation. *Vance*, 852 F.3d at 607-08. Therefore, *Vance* does not provide any authority for the majority's conclusion that the Federal Law has clearly been incorporated into our regulations.

Additionally, this federal opinion is not binding on us and not particularly persuasive. It is hardly surprising that a federal court might wish to apply the Federal Law and the case law interpreting it where Kentucky has not yet interpreted its own regulations.

I am further unmoved by the majority's conclusion that "legislative inaction here supports the conclusion that KRS Chapter 337 imports the Portal-to-Portal Acts exemptions" because the legislature has not acted in the more than thirty times it has convened in regular session to overrule the KDWS since it first incorporated the Federal Law into our statutes. As noted in

26

*Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 560 (Ky. 2011), "legislative inaction is a weak reed upon which to lean, and a poor beacon to follow in construing a statute." I believe this observation to be even more apt when it comes to construing a regulation in a manner in which it has never been interpreted before.

Finally, even were I in error in my conclusion that the KDWS has never implicitly incorporated the Federal Law via regulations, the KDWS has certainly not incorporated the Federal Law in such a clear manner that the General Assembly should be on notice that such an incorporation took place. Furthermore, there have been no Kentucky cases prior to this one to alert the General Assembly that this is how these regulations are being construed by Kentucky's appellate courts.

## IV. KENTUCKY'S APPLICABLE WAGE AND HOUR REGULATIONS, WHEN APPLIED TO THE RELEVANT FACTS, MAY WARRANT RELIEF

So, what do our applicable regulations require? 803 KAR 1:065, which expired in 2020 but was in effect at the time the litigation commenced, contains definitions relating to worktime and is applicable to this litigation and the timeframe at issue. However, for simplicity, I focus my discussion on the current regulations for hours worked, as they are very similar to our former regulations and use nearly identical pertinent phrasing, but I also quote from the former regulations in footnotes.

803 KAR 1:067 Section 3, concerning waiting time, adopts 29 C.F.R. 785.13 through 785.17. 29 C.F.R. 785.14 notes that it is a fact specific inquiry

as to whether an employee was engaged to wait or waited to be engaged.[25]  29 C.F.R. 785.15 explains an employee is on duty and working while waiting for the next task if the periods of inactivity are "unpredictable" and "are usually of short duration."  Key to such times is that "the employee is unable to use the time effectively for his own purposes.  It belongs to and is controlled by the employer.  In all of these cases waiting is an integral part of the job.  The employee is engaged to wait."  *Id.*[26]

In defining "off duty" in 29 C.F.R. 785.16, the regulation contrasts hours not worked as those "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes" with hours worked when such employee "is not completely relieved from duty and cannot use the time effectively for his own purposes[.]"[27]  29 C.F.R. 785.16(b) explains that a truck driver who has to wait

---

[25] Similarly, 803 KAR 1:065 § 3(1), regarding waiting time states in relevant part:

> Whether waiting time is worked under the act depends upon particular circumstances. . . .  Facts may show that the employee was engaged to wait, or they show that he waited to be engaged.  Such questions must be determined in accordance with common sense and the general concept of work or employment.

[26] This is consistent with 803 KAR 1:065 § 3(2) which provides examples of when an employee is "on duty" while waiting during a period of inactivity, such as when employees engage in personal activities while waiting an unpredictable amount of time for an assignment or for machinery to be repaired.  Importantly, this section notes during these periods "the employee is unable to use the time effectively for his own purpose.  It belongs to and is controlled by the employer.  In all of these cases waiting is an integral part of the job.  The employee is engaged to wait."  *Id.*

[27] Similarly, in 803 KAR 1:065 § 3(3)(a), "off duty periods" are times "during which an employee is completely relieved from duty and which are long enough to

at or near the job site for goods to be loaded and at the final destination to take care of the employer's property before a return trip is working as such employee is engaged to wait.[28] This contrast, between being able to use time effectively for the employee's own purposes as compared with the employer's purposes, is raised again as to whether in 29 C.F.R. 785.17 on-call time is work.

803 KAR 1:067 section 7, which contains the current travel time regulation, adopts 29 C.F.R. 785.33, 785.35, 785.38 and 785.39. 29 C.F.R. 785.35 explains that the ordinary commute from home to work and back again is not worktime.[29] 29 C.F.R. 785.38 explains that in contrast "[t]ime spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."[30] 29

---

enable him to use the time effectively for his own purposes are not hours worked." This section clarifies:

> [An employee] is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived. Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case.

[28] 803 KAR 1:065 § 3(3)(b) provides a similar trucker scenario.

[29] Similarly, 803 KAR 1:065 § 7(2) explains that "[n]ormal travel from home to work is not worktime."

[30] 803 KAR 1:065 § 7(3) explains "travel that is worktime" as follows:

> Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked. Where an employee is required to report at a meeting place to receive instructions or to perform other work there, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked.

C.F.R. 785.38 provides examples of when travel time is work time as including when "an employee is required to report at a meeting place to receive instructions . . . or to pick up and to carry tools[.]"

803 KAR 1:067 section 6, while at first blush is not directly applicable, as it establishes the requirements for lectures, meetings and training programs by incorporating 29 C.F.R. 785.27 through 785.32, also provides additional clarity in the difference between work and non-work hours. The basic distinction between work and non-work hours is that when attendance is involuntary because it is required, these are work hours, 29 C.F.R. 785.28, while if attendance is voluntary and the employee engages in such activity that is not directly related to the job and does not take place during work hours, such time is not compensable as work, 29 C.F.R. 785.29.[31]

As should be evident from this review, going through security checkpoints does not perfectly fit into these categories but the purpose of this security time and what employees can or cannot do during this time, and the fact that this process is required by the employer, is highly relevant to

---

The wording of both 29 C.F.R. 785.38 and 803 KAR 1:065 § 7(3) raises the question as to whether a security checkpoint is one job site which must be traveled from to reach another job site, where the employee commences work, or if the security checkpoint could be considered part of a larger job site, with going through security being part of the principal activity.

[31] 803 KAR 1:065 § 6(1) provides four specific criteria that must be met for attendance at lectures, meetings and trainings to not be considered "working time." Among these are that attendance is voluntary. In defining "involuntary attendance," 803 KAR 1:065 § 6(1) explains: "Attendance is not voluntary if it is required by the employer. It is not voluntary if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance."

30

determining whether it is compensable. I believe under the KDWS regulations that the employees' allegations are more than sufficient to maintain this action for unpaid wages for the time they mandatorily must spend passing through security for UPS's benefit. However, whether this time is definitively compensable cannot be resolved at this juncture.

## V. EVEN IF THE FEDERAL LAW APPLIES, REVERSAL FOR FURTHER FINDINGS IS STILL WARRANTED

Even assuming that the majority opinion is correct that our legislature or the KDWS have *sub silentio* adopted the Federal Law generally (a conclusion that I strongly disagree with), the majority opinion errs in its application of it at this juncture with the limited record before us. The United States Supreme Court concluded in *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37, 135 S. Ct. 513, 519, 190 L. Ed. 2d 410 (2014), that anti-theft security screenings upon leaving work are not "integral and indispensable to the principal activities that an employee is employed to perform" as such screenings are not "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Vance* followed this reasoning, also, for Amazon's anti-theft security screenings.

However, even if these cases were to apply, strong distinguishing factors here are that the limited evidence we have is that UPS's screenings at its Worldport facility were not principally for anti-theft purposes and that these screening processes took place at both ends of the workday. *Vance* specifically disclaimed that the security screening which only occurred after the employees completed their work, could be characterized as either travel from job site to

31

job site or as wait time, "because [the employees] do not perform or anticipate performing other principal job activities after the screening." 852 F.3d at 615. These distinguishing factors alone, should have compelled a reversal.

More apt of a comparison to the situation at hand can be found in *Steiner v. Mitchell*, 350 U.S. 247, 247, 76 S. Ct. 330, 331, 100 L. Ed. 267 (1956), a "case which raise[d] the issue of coverage under the Fair Labor Standards Act, as Amended by the Portal-to-Portal Act . . . with respect to work performed before or after the direct or productive labor for which the worker is primarily paid."

> The precise question [in *Steiner*] [was] whether workers in a battery plant must be paid as a part of their 'principal' activities for the time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health hygiene, to change clothes and to shower in facilities which state law requires their employer to provide, or whether these activities are 'preliminary' or 'postliminary' within the meaning of the Portal-to-Portal Act and, therefore, not to be included in measuring the work time for which compensation is required under the Fair Labor Standards Act.

*Id.* The specific hazards employees faced in *Steiner* was exposure to lead in various forms and sulphuric acid. *Id.* at 249-50, 76 S. Ct at 332.

Relevant considerations for the Supreme Court included that showering and changing clothes was mandated by state law, was also a requirement of the employer being able to obtain workers compensation insurance, and that such practices were needed for the employees' health. The Supreme Court recounted that the "[s]afe operation [of the battery plant] . . . requires the removal of clothing and showering at the end of the work period. This has

32

become a recognized part of industrial hygiene programs in the industry, *and the state law of Tennessee requires facilities for this purpose.*"  *Id.* at 250, 76 S. Ct. at 332 (emphasis added).  The Supreme Court noted that the employer's requirement that the workers change clothing and shower was also needed so the employer could obtain the legally mandated workers compensation insurance which covered lead poisoning as a compensable occupational disease because "the insurance carrier would not accept the insurance risk if defendants refused to have showering and clothes-changing facilities for their employees."  *Id.* at 251, 76 S. Ct. at 332-33.  Finally, the Supreme Court recounted that "the employees testified and the foreman declared in a signed statement that 'In the afternoon the men are required by the company to take a bath because lead oxide might be absorbed into the blood stream.  It protects the company and the employee both.'"  *Id. at* 251, 76 S. Ct. at 333.

Given this evidence, the Supreme Court concluded that changing clothes before and showering after a shift under these circumstances was "an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a) (1) [of the Portal-to-Portal Act][,]" reasoning "it would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees."  *Id.* at 256, 76 S. Ct. at 335.

Another illustrative case is that of *Mitchell v. King Packing Co.*, 350 U.S. 260, 76 S. Ct. 337, 100 L. Ed. 282 (1956).  In *Mitchell*, knifemen at a

33

meatpacking plant were required to sharpen their knives outside of their work shifts so that the knives would be sharp enough to perform butchering tasks. *Id.* at 262, 76 S. Ct. at 339. The Supreme Court ruled:

> We believe the facts clearly demonstrate that the knife-sharpening activities of these workmen are an integral part of and indispensable to the various butchering activities for which they were principally employed, and that they must be compensated for by respondent in compliance with the Fair Labor Standards Act, as amended by the Portal-to-Portal Act, and as construed by us today in Steiner v. Mitchell.

*Id.* at 263, 76 S. Ct. at 339.

Similarly, I believe that any employee in the class who must pass through security screenings so that UPS can (1) comply with mandatory TSA, DEA and FDA regulations, (2) satisfy C-TPAT screening requirements (thus gaining expedited customs processing for the packages it imports, resulting in the rapid delivery customers have come to expect), and (3) honor whatever additional screening requirements for which its shipping partners have contracted, may be entitled to compensation for this time. If these requirements apply to the security screenings the workers in the class are required to complete, then if the employees did not pass through such security, UPS could not lawfully, expeditiously, or contractually conduct its shipping business. By going through such screenings, employees facilitate and make possible the performance of UPS's packaging shipping business in general and, thus, this time may be characterized as integral and indispensable to the

34

employee's principal activities for UPS even under the rigorous standards of the Federal Law.[32]

## VI. CONCLUSION

I disagree with the majority opinion's conclusion that the grant of partial judgment on the pleadings was appropriate. I believe I have amply established that there are potential facts that the workers could prove that would entitle them to relief. Just as the battery plant workers could not assemble batteries without changing their clothing and showering, and the knifemen could not butcher without sharpening their knives, the as yet undetermined facts may establish that UPS could not ship its packages without its employees going through such security screenings. Accordingly, I would reverse and remand for further factual findings and proceedings.

Keller and Lambert, JJ., join.

COUNSEL FOR APPELLANTS:

Andrew Michael Grabhorn
Michael Douglas Grabhorn
Grabhorn Law

Andrew John Horne
Horne Law Office

---

[32] Of course, not all of these requirements may be necessary for such screenings to still be integral and indispensable to the employee's principal activities.

COUNSEL FOR APPELLEES:

Samuel Benjamin Goldstein
Joseph Russell Palmore
Morrison & Foerster, LLP

Kyle Donald Johnson
Charles Laurence Woods, III
Frost Brown Todd, LLC

John Choate Roach
Ransdell Roach & Royce, PLLC


COUNSEL FOR AMICUS, AIRLINES
FOR AMERICA:

James Burton Lind
Vorys, Sater, Seymour & Pease, LLP


COUNSEL FOR AMICUS, CHAMBER
OF COMMERCE OF THE UNITED
STATES OF AMERICA:

Philip Williamson
Taft Stettinius & Hollister, LLP


COUNSEL FOR AMICUS, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL UNION 369:

Benjamin Sequoyah Basil
Schulz Messex Dermody, PLLC

COUNSEL FOR AMICUS, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS LOCAL 783:

Jerome Park Prather
Garmer & Prather, PLLC

COUNSEL FOR AMICUS, KENTUCKY CHAMBER
OF COMMERCE:

Philip Williamson
Taft Stettinius & Hollister, LLP
COUNSEL FOR AMICUS, KENTUCKY EQUAL
JUSTICE CENTER:

John Saoirse Friend
Friend Law, PSC


COUNSEL FOR AMICUS, KENTUCKY
JUSTICE ASSOCIATION:

Michele Diane Henry
Craig Henry, PLC


COUNSEL FOR AMICUS, KENTUCKY RETAIL
FEDERATION:

Philip Williamson
Taft Stettinius & Hollister, LLP

COUNSEL FOR AMICUS, NATIONAL
RETAIL FEDERATION:

Philip Williamson
Taft Stettinius & Hollister, LLP